FIRST NATIONAL BANK AND TRUST COMPANY, Rogers, Arkansas, Appellee,

v.

A.L. HOLLINGSWORTH, Jr.; Sam Swanson, a/k/a Sam Berg, a/k/a Sam Berger; Don Gore; Judy Gore; Network Clearing Service, Inc.; Consumer Home Marketing, Inc.;

Romano Schreiber, Appellant,

Jodie Nicholson;

The Schedule; Big Jule's Sports Service of Las Vegas, Inc., Appellants,

Billy Gene Ashworth; John Doe # 1; John Doe # 2.

FIRST NATIONAL BANK AND TRUST COMPANY, Rogers, Arkansas, Appellee,

v.

A.L. HOLLINGSWORTH, Jr.;

Lorene Hollingsworth, Appellant,

Sam Swanson, a/k/a Sam Berg, a/k/a Sam Berger;

Don Gore; Judy Gore, Appellants,

Network Clearing Service, Inc.; Consumer Home Marketing, Inc.; Romano Schreiber; Jodie Nicholson; The Schedule; Big Jule's Sports Service of Las Vegas, Inc.; Billy Gene Ashworth; John Doe # 1; John Doe # 2.

FIRST NATIONAL BANK AND TRUST COMPANY, Rogers, Arkansas, Appellee,

v.

A.L. HOLLINGSWORTH, Jr., Appellant,

Sam Swanson, a/k/a Sam Berg, a/k/a Sam Berger, Don Gore; Judy Gore; Network Clearing Service, Inc.; Consumer Home Marketing, Inc.; Romano Schreiber; Jodie Nicholson; The Schedule; Big Jule's Sports Service of Las Vegas, Inc.; Billy Gene Ashworth; John Doe # 1; John Doe # 2.

FIRST NATIONAL BANK AND TRUST COMPANY, Rogers, Arkansas, Appellee,

v.

A.L. HOLLINGSWORTH, Jr.; Sam Swanson, a/k/a Sam Berg, a/k/a Sam Berger, Don Gore; Judy Gore; Network Clearing Service, Inc.; Consumer Home Marketing, Inc.; Romano Schreiber;

Jodie Nicholson, Appellant,

The Schedule; Big Jule's Sports Service of Las Vegas, Inc.; Billy Gene Ashworth; John Doe # 1; John Doe # 2.

Nos. 90–1336 through 90–1339.

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 8, 1990.

Decided May 1, 1991.

James E. Evans, Springdale, Ark., for appellant.

David R. Matthews, Rogers, Ark., for appellee.

Before LAY, Chief Judge, BRIGHT and TIMBERS,* Senior Circuit Judges.

BRIGHT, Senior Circuit Judge.

Defendants A.L. Hollingsworth and Romano Schreiber appeal the judgment of the district court in favor of First National Bank and Trust Company of Rogers, Arkansas, under the civil provisions of the Racketeer Influenced Corrupt Organizations Act (RICO), 18 U.S.C. §§ 1961–68 (1988). Schreiber and Hollingsworth allegedly operated a credit card fraud scheme under the auspices of Consumer Home Marketing, Inc. (CHM). Hollingsworth and Schreiber, as well as defendants Jodie Nicholson, Big Jule's Sports Service of Las Vegas, Inc. and Judy Gore, appeal related judgments rendered against them for receiving CHM funds allegedly transferred in violation of Arkansas fraudulent conveyance law, Ark.Code Ann. §§ 4–59–201 to 213 (Supp.1989). A.L. and Lorene Hollingsworth appeal the district court's grant of judgment notwithstanding the jury's verdict awarding damages in the Hollingsworths' counterclaim for wrongful attachment. Finally, Lorene Hollingsworth and

---

* The HONORABLE WILLIAM H. TIMBERS, Senior Circuit Judge, United States Court of Appeals for the Second Circuit, sitting by designation.

Don and Judy Gore appeal the district court's denial of their various motions for sanctions pursuant to Fed.R.Civ.P. 11. For the reasons expressed below, we vacate the RICO judgment against Hollingsworth and remand for further proceedings. We also vacate the fraudulent transfer judgment against Judy Gore. We affirm the district court in all other respects.

## I. BACKGROUND

### A. Facts

The disputes leading to these appeals arise from the activities of CHM, an Arkansas telemarketing corporation which A.L. Hollingsworth and Romano Schreiber founded in August 1987. Schreiber, a Las Vegas oddsmaker and telemarketer, provided the start-up capital and initially held a ninety percent stake in CHM and the title of President. Hollingsworth, an Arkansas computer consultant and programmer, provided the technical expertise. He initially held a five percent stake in CHM and the title of Secretary.[1]

Shortly after founding CHM, Hollingsworth and Schreiber attempted to secure a bank merchant account which would enable CHM to conduct credit card transactions. The First National Bank of Springdale, Arkansas, rejected their first application in September 1987 because of the high incidence of fraud associated with telemarketing ventures like CHM. Without a merchant account, CHM remained inactive through the end of 1987. Late in 1987, Schreiber transferred his interest in CHM to Hollingsworth, apparently for no consideration. Consequently, Hollingsworth became the principal owner and President of CHM.

In early 1988, Hollingsworth again attempted to secure a merchant account for CHM and submitted applications to First National Bank of Springdale and Bank of Fayetteville. In each application, Hollingsworth represented that CHM intended to use the merchant account for telemarketing purposes. Both banks rejected the applications, again, because of the high incidence of fraud in the telemarketing industry.

In February 1988, Hollingsworth submitted another merchant account application, this time with plaintiff First National Bank and Trust of Rogers, Arkansas (First National). In this fourth merchant account application, Hollingsworth represented CHM as a retailer of computer equipment and software. First National approved the application and opened a merchant account in CHM's name. Hollingsworth signed a merchant account agreement prohibiting the use of the merchant account for any purpose other than selling computer equipment and software. The agreement also specified that First National would hold Hollingsworth and CHM liable for any deficits in the account.

CHM almost immediately began receiving credit card charge slips and depositing them into the merchant account. However, unbeknownst to First National, none of the charges arose from the sale of computer equipment or software. Apparently, most of CHM's business activities involved the "factoring"[2] of credit card charges generated by telemarketing merchandisers. This activity breached CHM's agreement with First National which prohibited the use of the merchant account for purposes other than direct sales of computer equipment.

CHM procured factoring clients through Schreiber who, despite having severed his

1. Billy Gene Ashworth, the initial Vice–President and third founding member, held the remaining five percent interest in CHM. Ashworth and CHM parted ways late in 1987.

2. Merchandisers who accept credit cards typically must wait as long as sixty days before they receive their money from the credit card companies. However, merchandisers who wish to receive their money sooner may submit their charge slips to intermediaries who "factor" the charges. In this arrangement, the intermediary, like CHM, takes the charge slips and deposits them in a bank merchant account. The bank typically credits these merchant account deposits within a few days, often within twenty-four hours. The intermediary then draws on the

formal relationship with CHM, referred Las Vegas telemarketing merchandisers to CHM. Schreiber, along with Jodie Nicholson, Schreiber's Las Vegas associate, and Big Jule's Sports Service of Las Vegas, Inc. d/b/a The Schedule, an oddsmaking corporation which Schreiber and Nicholson owned and operated, also provided CHM with advice and operational support in February and March of 1988 as CHM began to conduct business. In April 1988, customers of the Las Vegas telemarketing enterprises which Schreiber had referred to CHM filed requests for over $87,000 in chargebacks after complaining that they had not received merchandise they had ordered despite having been billed for it. CHM and Hollingsworth refunded the entire amount.

Between May and August of 1988, CHM sporadically continued to factor charges for telemarketers. However, CHM severed its relationship with its principal client, Diamond Enterprises, in the summer of 1988 due to continuing problems with fraudulent telemarketing transactions. During this period, First National finally determined that CHM had not been selling computer equipment as it had represented, but instead had been factoring charges for telemarketers in violation of the merchant account agreement. Consequently, on August 17, 1988, First National gave Hollingsworth notice that it would terminate CHM's merchant account in sixty days.

In the meantime, Hollingsworth began making inquiries about selling CHM. Although the volume of CHM's business had dropped precipitously and it was about to lose its merchant account, Schreiber again provided Hollingsworth with critical assistance and found a buyer for CHM. Schreiber introduced Hollingsworth to Sam Swanson who, on August 26, 1988, purchased the moribund CHM from Hollingsworth for $30,000.

First National, in response to Hollingsworth's direct inquiries, had informed Hollingsworth on two previous occasions that it would not transfer the merchant account to a new owner in the event Hollingsworth sold CHM. It further informed him that the sale of CHM would result in the immediate termination of the merchant account. Hollingsworth nonetheless transferred CHM's merchant and checking accounts to Swanson without notifying appropriate bank officials about the sale of CHM.

Hollingsworth continued to work with CHM following the sale and throughout September 1988, purportedly to ease the transition of ownership. Just prior to and immediately after the sale of CHM to Swanson, CHM began to factor charges for various new clients associated with Swanson. Later events revealed that many of the charges were fraudulent. Schreiber, who flew to Arkansas from Las Vegas shortly after the sale of CHM to Swanson, also actively participated in the post-sale activities and was frequently seen at the CHM office throughout September 1988. Trial testimony revealed that in September 1988 CHM not only processed charges from Schreiber's Las Vegas company, Big Jule's, but also that some of the fraudulently generated charges were billed to consumers who previously had been victims of unauthorized charges by another company associated with Schreiber.

account by writing a check back to the merchandiser covering the total of the charge slips less a factoring fee for providing the service (usually a flat percentage of the total dollar amount of the factored charge slips). The merchandiser thus receives cash for the charges within a few days, rather than the usual sixty day processing period.

The intermediary's merchant account bank has, in effect, extended credit to the intermediary until the credit card company processes the charge slips. Banks that accept factored credit card charges run a greater risk of fraud because their relationship is not with the merchandiser selling the goods or services, but with the intermediary. Such banks often have no way of determining the identity of the merchandiser and, thus, they cannot monitor the integrity of the underlying transactions giving rise to the credit card charges. Banks that process factored charges charge a higher service fee to compensate for the increased risk. Many other banks simply refuse to process factored charges altogether.

In addition to factoring a large number of fraudulently generated charges, CHM, through Swanson, also withdrew large sums of money from the First National merchant account. In addition to transferring money to Big Jule's and Schreiber for factored charges generated by Big Jule's, Swanson also wrote a number of checks transferring approximately $35,000 in CHM funds to Schreiber and his Las Vegas operations. Schreiber, in turn, signed the checks over to Nicholson for deposit into various personal and business bank accounts. Schreiber claimed that these transfers represented payments for finder's fees and commissions for arranging the sale of CHM and bringing in new business. He also claimed that part of the money settled old debts which CHM owed him as a result of earlier loans he allegedly made to CHM.

Additionally, Swanson transferred approximately $26,000 to Hollingsworth, purportedly as payment for the sale of the company. Thus, Swanson financed his purchase of CHM by withdrawing funds from CHM's corporate coffers. Finally, Swanson conducted a number of irregular business and banking transactions resulting in the transfer of CHM funds to various individuals, including defendant Judy Gore who sold Swanson used computer equipment for approximately $9,900 in late September 1988.

The increase in merchant account activity and the large transfers of cash caught the attention of bank officials who, on September 29, 1988, finally determined that Hollingsworth had sold CHM. First National immediately closed the merchant account, forcing CHM to close its operation. Swanson and Schreiber left town. Soon after, First National began to receive a wave of notifications of chargebacks for unauthorized charges submitted by CHM. Ultimately, First National paid out 545 charge-backs from April 1988 to July 1989 totalling $199,355.27. Most of the chargebacks resulted from unauthorized charges in late August and September of 1988, after Hollingsworth sold CHM to Swanson. First National used money remaining in the CHM merchant account to settle some of the chargebacks, but it ultimately incurred a loss of $135,186.36.

## B. District Court Proceedings

First National filed this action on November 26, 1988, in which it alleged that Hollingsworth, Schreiber, Swanson, Jodie Nicholson, Lorene Hollingsworth, Judy Gore, and various other individuals, as well as CHM, Big Jule's and other Schreiber corporate entities, participated in a credit card fraud scheme in violation of the civil RICO provisions, 18 U.S.C. § 1962(a)-(d) (1988). First National alleged numerous incidents of mail and wire fraud as the underlying predicate acts giving rise to RICO liability. First National's complaint also included claims under the Arkansas Fraudulent Transfer Act, Ark.Code Ann. §§ 4–59–201 to 213 (Supp.1989), against the various defendants who received money which Swanson transferred from the CHM account.

At the same time, First National obtained a writ of attachment against A.L. and Lorene Hollingsworth freezing their personal savings and checking accounts. The writ of attachment denied the Hollingsworths access to their personal assets for approximately one month, at which time the district court dissolved the writ as being unconstitutional under state law. The Hollingsworths then filed a counterclaim alleging damages from the wrongful attachment.

### 1. RICO Claims

Prior to trial, the district court, with the consent of the parties, bifurcated its consideration of the RICO and fraudulent transfer claims.[3] The district court conducted a four-day jury trial on the RICO claims in October 1989. First National devoted a significant portion of its case-in-chief

---

3. The parties agreed that the fraudulent transfer portion of the action presented equitable issues which the district court could properly address separately from the RICO jury trial. Thus, following the conclusion of the RICO trial, the district court reconsidered all of the evidence as

to reading A.L. Hollingsworth's pre-trial deposition into the record. First National attempted to call Hollingsworth to testify. However, Hollingsworth did not attend the initial stage of the trial because First National never subpoenaed him. Thus, with the permission of the district court, First National read Hollingsworth's extensive pre-trial deposition into the record as Fed. R.Evid. 801(d)(2) admissions by a party-opponent.

At the end of First National's case-in-chief, the district court directed a verdict in favor of defendant Judy Gore. Some confusion existed regarding the scope of the directed verdict. Specifically, a question arose as to whether the district court was directing Gore out of the RICO phase only, or dismissing both the RICO and fraudulent transfer claims against her. The district court apparently believed that Judy Gore had not been named as a defendant in the fraudulent transfer action, but reserved judgment until it had a chance to review the complaint.

The remaining parties then proceeded to put on their defense. The attorney for A.L. Hollingsworth attempted to call his client to testify. The district court, however, refused to allow Hollingsworth to give any testimony regarding the RICO claims against him, stating that Hollingsworth had already testified at length through his deposition. After brief testimony from the Hollingsworths regarding the wrongful attachment counterclaim, the jury found A.L. Hollingsworth, Schreiber, Swanson and CHM jointly and severally liable for violations of RICO and awarded statutory treble damages totalling $405,559.08. The jury found in favor of the remaining RICO defendants. On October 26, 1989, the district court entered an order and judgment based on the jury's verdict in the RICO proceedings. The order expressly dismissed "all claims" against the Gores.

The jury also awarded the Hollingsworths $5,000 in compensatory damages on their counterclaim against First National for wrongful attachment. However, the district court granted judgment notwithstanding the verdict in favor of First National after determining that the jury assessed damages on a speculative basis. The district court also subsequently denied Lorene Hollingsworth's and Don and Judy Gore's [4] motions for sanctions under Fed.R. Civ.P. 11.

### 2. Fraudulent Transfer Claims

On November 3, 1989, the district court conducted a hearing in equity at which it considered the evidence entered during the RICO phase as it related to the fraudulent transfer claims and received any additional evidence the parties had to offer regarding these claims. In January 1990, the district court entered a final order which set aside the transfers of CHM funds to Hollingsworth, Nicholson and Schreiber, both individually and in their various corporate guises, and entered judgments against each of them accordingly. Inexplicably, the district court also entered a $9,900 fraudulent transfer judgment against Judy Gore despite having previously dismissed "all claims" against her in its earlier order entered at the close of the RICO phase of the litigation. The court did not provide Gore with notice that it intended to revise or amend the first order, nor did it provide Gore with notice of the hearing addressing the fraudulent transfer claims.

The various defendants now appeal the judgments entered on both the RICO and fraudulent conveyance claims.[5] Schreiber and Hollingsworth appeal the sufficiency of the evidence supporting the RICO verdicts against them. Hollingsworth also

---

it related to the fraudulent transfer claims. The court also held a separate hearing to provide the parties with an opportunity to respond to or supplement the record as it related to the fraudulent transfer claims.

4. The district court directed a verdict in favor of Don Gore at the end of First National's RICO case-in-chief.

5. All of the defendants against whom judgment was entered appeal except for CHM and Swanson. Neither of these parties appeared below.

contends that the district court improperly prohibited him from testifying on his own behalf during the RICO proceedings. Schreiber, Nicholson and their various corporate entities contend that the district court erroneously entered judgment against them on the fraudulent transfer claims. Judy Gore contends that the district court lacked jurisdiction to enter judgment on the fraudulent transfer claim against her. In addition, the Hollingsworths appeal the judgment notwithstanding the verdict regarding their wrongful attachment counterclaim to the RICO action. Finally, Lorene Hollingsworth and Don and Judy Gore appeal the district court's denial of their various motions for discovery costs and Rule 11 sanctions against First National, contending that their total vindication on the RICO claims suggests that First National failed to reasonably inquire into the facts prior to filing its complaint.

## II. DISCUSSION

### A. RICO

■ Schreiber and Hollingsworth each assert that the evidence adduced at trial was not sufficient to establish civil RICO liability. Under the RICO statute, First National needed to prove that Schreiber and Hollingsworth engaged in or conspired to engage in a "pattern of racketeering activity." 18 U.S.C. § 1962 (1988);[6] *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 105 S.Ct. 3275, 87 L.Ed.2d 346 (1985). The statute defines "racketeering activity" to include wire fraud and mail fraud, the underlying predicate acts alleged in the present action. 18 U.S.C. § 1961(1) (1988). A "pattern" is comprised of at least two predicate acts manifesting the elements of "continuity plus relationship." *Sedima*, 473 U.S. at 496 n. 14, 105 S.Ct. at 3285 n. 14 (citations omitted); *H.J. Inc. v. North-*

*western Bell Tel. Co.*, 492 U.S. 229, 238–39, 109 S.Ct. 2893, 2900, 106 L.Ed.2d 195 (1989). Schreiber and Hollingsworth specifically assert that the evidence fails to establish the requisite "relationship" and "continuity" elements, as defined most recently by the Supreme Court in *H.J. Inc.*

■ *H.J. Inc.* reaffirmed the long standing principle that a RICO "relationship" between predicate acts exists where they " 'have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events.' " *Id.* at 240, 109 S.Ct. at 2901 (quoting Title X, § 1001(a) of the Organized Crime Control Act of 1970, Pub.L. 91–452, 84 Stat. 948). *H.J. Inc.*'s unique contribution to RICO jurisprudence is its refinement of the definition of "continuity." According to the Supreme Court,

'Continuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition. It is, in either case, centrally a temporal concept.... A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement.... Often a RICO action will be brought before continuity can be established in this way. In such cases, liability depends on whether the *threat* of continuity is demonstrated.

Whether the predicates proved establish a threat of continued racketeering activity depends on the specific facts of each case.

6. The liability provision of the RICO statute, 18 U.S.C. § 1962, "renders ... civilly liable 'any person' who uses or invests income derived 'from a pattern of racketeering activity' to acquire an interest in or to operate an enterprise engaged in interstate commerce, § 1962(a); who acquires or maintains an interest in or control of such an enterprise 'through a pattern of racketeering activity,' § 1962(b); who, being employed by or associated with such an enterprise, conducts or participates in the conduct of its affairs 'through a pattern of racketeering activity,' § 1962(c); or, finally, who conspires to violate the first three subsections of § 1962, § 1962(d)." *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 232–33, 109 S.Ct. 2893, 2897, 106 L.Ed.2d 195 (1989).

492 U.S. at 241–42, 109 S.Ct. at 2902 (emphasis in original) (citations omitted).

We turn now to the application of these principles to the case against Schreiber. We construe Schreiber's argument to be, in effect, that the district court erred in denying his motion for judgment notwithstanding the verdict and new trial. *See, e.g., Sprynczynatyk v. General Motors Corp.,* 771 F.2d 1112, 1124 & n. 16 (8th Cir.1985), *cert. denied,* 475 U.S. 1046, 106 S.Ct. 1263, 89 L.Ed.2d 572 (1986). Therefore, we construe the evidence in the light most favorable to the jury verdict, and take as established all reasonable inferences from the facts tending to support the prevailing party. *Grinder v. Southern Farm Bureau Casualty Ins. Co.,* 590 F.2d 741 (8th Cir.1979). Under this fairly restrictive standard of review, we conclude that the evidence more than sufficed to support the verdict against Schreiber.

Schreiber directly or indirectly participated in the submission of hundreds of fraudulent credit card charges by CHM, each constituting a separate act of wire or mail fraud. Many of the charge slips originated from telemarketing ventures which were associated with Schreiber in some capacity. The similarity of method, purpose and result clearly establish a "relationship" between the predicate acts.

Schreiber contends, however, that the underlying predicate acts occurred only from the end of August 1988, when Hollingsworth sold CHM to Swanson, through September 1988, when First National terminated the merchant account and CHM ceased operating. Schreiber argues that illegal activities extending over a mere four week period do not establish the requisite continuity necessary to prove a pattern. *See H.J. Inc.,* 492 U.S. at 241–43, 109 S.Ct. at 2902 (predicate acts extending over a few weeks which do not pose threat of future criminal conduct do not satisfy continuity prong).

The evidence clearly demonstrates, however, that some of the unauthorized charges occurred prior to this final period of activity. Indeed, First National incurred losses for chargebacks on unauthorized charges from April 1988 through July 1989. Furthermore, the evidence shows that some of the fraudulent charges were billed to accounts drawn from a "sucker list" of credit cardholders who had been victims of unauthorized charges generated by another Schreiber-associated company as far back as the summer of 1987. A jury could reasonably infer from this evidence that Schreiber's activities extended over a lengthy period and presented a threat of continuing illegal activity. Thus, the jury had ample evidence from which to conclude that the underlying predicate acts constituted a pattern of illegal racketeering activity.

Hollingsworth also challenges the sufficiency of the evidence supporting the RICO verdict against him. However, our resolution of this issue on appeal is complicated by Hollingsworth's contention that the district court improperly denied him the opportunity to testify in his own defense. Hollingsworth asserts, in essence, that his improperly excluded testimony would have rebutted enough of First National's case against him to have left the jury with insufficient evidence upon which to base a finding of liability. We therefore turn our attention to the appropriateness of the district court's refusal to permit Hollingsworth to testify.

### B. Exclusion of Testimony

Traditionally, we accord the trial judge "broad discretion in the conduct of [a] trial." *Dobson v. Bacon Transp. Co.,* 607 F.2d 805, 807 (8th Cir.1979). Accordingly, "[t]rial courts have discretion to place reasonable limits on the presentation of evidence to prevent undue delay, waste of time, or needless presentation of cumulative evidence." *Johnson v. Ashby,* 808 F.2d 676, 678 (8th Cir.1987) (citations omitted); *see* Fed.R.Evid. 403, 611. We therefore typically review the conduct of a trial only for abuse of discretion. *Dobson,* 607 F.2d at 807.

The district court failed to provide any clear reason for imposing the drastic measure of barring the defendant from testifying. Nor can we surmise from our

examination of the record any possible justification for sustaining the ruling. At best, the trial transcript tenuously suggests two possible motivations for the district court's ruling.

First, the transcript could be read to suggest that the district court believed that Hollingsworth's testimony would be cumulative. The district court noted that Hollingsworth could have testified when First National called him to the stand during its case-in-chief. It then indicated that it viewed Hollingsworth's decision to remain outside the courtroom during plaintiff's phase of the trial as a strategic decision to testify only through his lengthy pre-trial deposition which the district court permitted First National to read aloud to the jury. The length of the deposition, which counsel at oral argument indicated took upwards of six hours to read into the record, appears to have led the district court to conclude that Hollingsworth could not possibly provide any additional information by testifying a "second" time when the defense put on its case. However, there is no basis in the record for drawing such a conclusion. In particular, we note that the trial court never sought, nor did defense counsel ever make, an offer of proof as to the nature of the proposed testimony. Without knowledge of the content of the testimony it was excluding, the district court could not have known whether it was cumulative.

The only other possible basis for the district court's action that we might draw from the record is that the district court excluded the testimony in an effort to bring the trial to a rapid conclusion. However, it is "an abuse of the trial court's discretion to exclude probative, non-cumulative evidence simply because its introduction will cause delay." *Johnson v. Ashby*, 808 F.2d at 678. In the absence of some proper basis in the record, or, more preferably, some explanation from the district court for its blanket prohibition of the defendant's testimony, we must conclude that the district court abused its discretion.

Hollingsworth's failure to make an objection to the exclusion and an offer of proof, however, adds one more wrinkle to our analysis. The absence of an offer of proof leaves us uncertain as to whether Hollingsworth would present testimony possessing probative value on the question of liability. We note that the district court assessed First National's case against Hollingsworth as one in which "the jury could go either way" on the question of liability, tr. 785, which suggests that Hollingsworth's excluded testimony, even if cumulative, may have influenced the jury in his favor and thus may have been of major importance.

In the absence of an appropriate objection, we may reverse the district court only if it has committed "plain error." *Higgins v. Hicks Co.*, 756 F.2d 681, 684 (8th Cir. 1985); *see* Fed.R.Evid. 103. A plain error is error which " 'has affected seriously the fairness ... of [the] judicial proceedings.' " *Rogers v. Rulo*, 712 F.2d 363, 368 (8th Cir.1983) (quoting *Johnson v. Houser*, 704 F.2d 1049, 1052 (8th Cir.1983) (per curiam)), *cert. denied*, 464 U.S. 1046, 104 S.Ct. 719, 79 L.Ed.2d 181 (1984). We are satisfied that the district court's exclusion of Hollingsworth's testimony constitutes such an error. Under the present circumstances, we regard the judgment against Hollingsworth as fundamentally unfair. Whether or not Hollingsworth's testimony is cumulative to that given in the deposition is immaterial. As a party and a material witness, he should be given every opportunity to allow the jury to observe his demeanor and pass upon his credibility. If Hollingsworth's testimony has any evidentiary value helpful to the defense, the jury should be given an opportunity to pass on it. We therefore remand to the district court for further proceedings. The district court should determine whether or not Hollingsworth's testimony has probative value for the defense. If it does, the court should grant a new trial. Otherwise, the court should enter a judgment anew in favor of First National. In order to provide a proper vehicle for hearing Hollingsworth's testimony, we specifically direct the district court to vacate the RICO judgment against him.

### C. Hollingsworths' Counterclaim for Wrongful Attachment

A.L. and Lorene Hollingsworth contend that the district court erred in

granting judgment notwithstanding the verdict to First National after concluding that the jury's award of $5,000 in compensatory damages for First National's wrongful attachment was entirely speculative.[7] In reviewing the grant of j.n.o.v., we review all the evidence and all reasonable inferences arising from the evidence in the light most favorable to the Hollingsworths as the prevailing party below. *In re Knickerbocker*, 827 F.2d 281, 284 (8th Cir. 1987). Thus, we resolve any factual conflicts in favor of the Hollingsworths, assume as true all facts which the Hollingsworths' evidence tends to prove, giving them the benefit of all reasonable inferences derived therefrom. *See Ryko Mfg. Co. v. Eden Servs.*, 823 F.2d 1215, 1221 (8th Cir.1987), *cert. denied*, 484 U.S. 1026, 108 S.Ct. 751, 98 L.Ed.2d 763 (1988). We may reverse the grant of j.n.o.v. only if the evidence so viewed would allow reasonable jurors to differ as to the conclusions that could be drawn. *Id.* Applying this standard, we conclude that the evidence utterly fails to provide any basis for the jury's award of damages.

First National did not dispute the liability question, conceding that it had secured its pre-judgment attachment under procedures that the Arkansas Supreme Court had previously declared unconstitutional. In its instructions to the jury, the district court accordingly directed a verdict in favor of the Hollingsworths on the question of liability. Thus, only the issue of damages was put before the jury.

The Hollingsworths based their damages claim almost entirely upon their own brief testimony. Even giving the Hollingsworths the benefit of all reasonable inferences arising from this scant testimony, the evidence establishes at most that the Hollingsworths did not have access to their checking and savings accounts with First National of Springdale for approximately one month. Neither of the appellants offered any testimony or documentary evidence of their account balances, nor did they offer any evidence of expenses or losses incurred as a result of the attachment.[8] Thus, the Hollingsworths failed to provide the jury with any reasonable basis for assessing the actual impact of the wrongful attachment. We therefore agree with the district court's conclusion that the jury awarded damages on the basis of speculation and affirm its grant of j.n.o.v.

## D. Fraudulent Conveyance Claims

### 1. Schreiber, Nicholson and Corporate Entities

Schreiber, Jodie Nicholson and their various Las Vegas-based telemarketing operations appeal the district court's judgments entered against them as recipients of CHM funds transferred in violation of the Arkansas Fraudulent Transfer Act, Ark.Code Ann. §§ 4–59–201 to 213 (Supp. 1989). They principally contend that each of the multiple transfers which occurred in the final flurry of activity in September 1988 involved a subsequent transferee.

---

**7.** Under Arkansas law, a jury may not award damages on a speculative basis. *See, e.g., Duncan v. Foster*, 271 Ark. 591, 609 S.W.2d 62 (1980); *cf. Robertson v. Ceola*, 255 Ark. 703, 501 S.W.2d 764 (1973) (proof of lost profits must be sufficient to remove the question from the realm of speculation and conjecture).

**8.** Hollingsworth claims that he offered evidence of actual damages of $5,000 in legal expenses incurred in defending against the wrongful attachment. Hollingsworth testified that he paid $5,000 in cash to an attorney at the time First National filed its RICO and fraudulent conveyance suit. The $5,000 damages award suggests that the jury may have equated the cash payment to Hollingsworth's attorney with damages arising from the wrongful attachment. How-

ever, Hollingsworth did not offer any documentary evidence in support of his bald assertion that he made such a cash payment. Similarly, he offered no evidence or testimony that might indicate what portion, if any, of this cash payment related to legal expenses incurred in dissolving the writ of attachment as opposed to defending against the RICO, breach of contract and fraudulent transfer claims. Hollingsworth's bare testimony, as a matter of law, does not provide a sufficient basis to support the jury's award of damages. *See Snow v. C.I.T. Corp. of the South*, 278 Ark. 554, 647 S.W.2d 465 (1983) (damages claim not established with requisite degree of certainty where based solely upon testimony of interested party without accompanying documentary proof).

Under Arkansas law, transfers generally are not voidable against subsequent transferees. Ark.Code Ann. § 4–59–208(a).

The district court directly addressed this contention and found that the subsequent transfers were not made either in good faith or in exchange for reasonable equivalent value. The district court thus voided the subsequent transfers as dictated by the statutory exception to the subsequent transfer rule. *See* Ark.Code Ann. § 4–59–208(b). The appellants contend that the district court's findings and conclusions are not supported by sufficient evidence. Construing the evidence, as we must, in the light most favorable to the verdict, *Grinder v. Southern Farm Bureau Casualty Ins. Co.*, 590 F.2d 741 (8th Cir.1979); *Sprynczynatyk v. General Motors Corp.*, 771 F.2d 1112 (8th Cir.1985), we conclude that the evidence amply supported the district court's findings. We therefore affirm the fraudulent transfer judgments entered against Schreiber, Nicholson and their various corporate enterprises.

### 2. Gore

Judy Gore offers two separate arguments in support of her contention that the district court erred in entering the fraudulent transfer judgment against her. First, she argues that the district court did not have pendent jurisdiction over the state law claim once it dismissed the RICO claim which provided the basis for the federal court's jurisdiction over her. Second, she argues that even if the district court could have exercised pendent jurisdiction, the district court improperly entered judgment against her because it had previously dismissed "all claims" against her at the close of the RICO phase of the litigation. We address each argument in turn and, for the reasons set out below, vacate the fraudulent transfer judgment entered against Gore.

At the close of First National's case-in-chief in the RICO proceedings, the district court granted Gore's motion for a directed verdict and dismissed the claims against her. Gore contends that the dismissal of the RICO claims extinguished any pendent jurisdiction the district court may have had over the state law fraudulent transfer claim. We disagree. The mere fact that a federal claim providing the basis for federal jurisdiction ultimately fails does not require the district court to refrain from exercising jurisdiction over related state law claims. *United Mine Workers v. Gibbs*, 383 U.S. 715, 722, 86 S.Ct. 1130, 1136–37, 16 L.Ed.2d 218 (1966). We conclude that the present case clearly meets the criteria for the exercise of pendent jurisdiction over state claims set out by the Supreme Court in *Gibbs*.

The exercise of pendent jurisdiction under *Gibbs* requires first that the federal claim be substantial enough to provide the district court with subject matter jurisdiction. 383 U.S. at 725, 86 S.Ct. at 1138. A claim is "insubstantial only if ... prior decisions inescapably render the claim[ ] frivolous...." *Goosby v. Osser*, 409 U.S. 512, 518, 93 S.Ct. 854, 858–59, 35 L.Ed.2d 36 (1973), *quoted in Koke v. Stifel, Nicolaus & Co.*, 620 F.2d 1340, 1346 (8th Cir.1980). Second, both the federal and state claims must constitute one constitutional case, which exists where the claims derive from a "common nucleus of operative fact." *Gibbs*, 383 U.S. at 726, 86 S.Ct. at 1139. Third, the district court's discretionary exercise of pendent jurisdiction must comport with considerations of judicial economy, convenience and fairness to the litigants. *Id.*

In the present case, we conclude first that the federal RICO claim was clearly substantial and thus conferred subject matter jurisdiction upon the district court. In this regard, we note that the RICO claims against Gore survived a motion for summary judgment.[9] Second, the state

---

**9.** Gore points out that in granting her motion for directed verdict at the close of First National's RICO case-in-chief, the district court stated that at an earlier phase of the litigation, it "came

close to granting a summary judgment, but could not do it on the basis of the file that existed at that time." Tr. 787. This case would have presented a much closer question on the

and federal claims clearly arose from a common nucleus of facts. The activities giving rise to the state fraudulent transfer claims also lay at the core of the RICO scheme to defraud First National.

Finally, at the time the district court dismissed the RICO action against Gore, it had already expended significant time and resources to the case in empaneling a jury and receiving extensive evidence directly relating to both the federal and state law claims. Further, the fraudulent transfer at issue in the state law claim against Gore was part of a series of similar and related transfers which the district court addressed in consolidated proceedings against the core defendants. In this context, returning the state law claim against Gore to the state court would result in an unnecessary duplication of judicial efforts and waste of scarce judicial resources. We conclude, therefore, that the district court's exercise of pendent jurisdiction over the state law claim against Gore did not constitute an abuse of discretion.

■■■■ Gore contends alternatively that the district court relinquished its jurisdiction over the fraudulent transfer claim at the close of the RICO phase of the proceedings. The district court's grant of Gore's motion for directed verdict at the close of First National's case-in-chief in the RICO proceedings prompted the following exchange between the district court and counsel for First National.

[COUNSEL]: [A]re you directing [her] out of the RICO action or out of the action to set aside the transfers to them from Consumer Home Marketing.... We have an equitable issue before the Court, as to a transfer and fraud of creditors, and [is she] being dismissed out as to that, as well?

THE COURT: Well, I guess I hadn't thought about that, because I didn't realize that—I thought the issue about setting aside conveyances was in relation to

A.L. Hollingsworth. Is there also a claim—

[COUNSEL]: It's against all of the named defendants, I believe, Your Honor. I—

THE COURT: Well, since that's a judge question, I'll determine that at some later point.

. . . .

THE COURT: I'll determine, number one, whether such a claim was made against [her], and number two, whether [she] ought to be dismissed from that aspect of the case, if [she is] in that aspect of the case.

Tr. 786–87. Moments later, counsel for First National again spoke to the district court, apparently after having reviewed the complaint.

[COUNSEL]: Yes, Your Honor. A review of the amended complaint indicates that, indeed, ... Mrs. Gore [is] not mentioned as part[y] to the transfer and fraud of creditors, and so as respects to that, I would withdraw—

THE COURT: Yeah.

[COUNSEL]: —anything I said about that, and if the Court believes there is, we would dismiss at that point.

THE COURT: Yeah, I did not think [she was], but I had not reviewed that voluminous file in some time.

Tr. 789–90. The district court then moved on to other matters without making a formal ruling regarding the scope of the directed verdict, but apparently under the mistaken impression that Gore was not a party to the fraudulent transfer action. At the conclusion of the RICO trial, the district court entered an order and judgment which dismissed "*all claims* of the plaintiff as stated in its amended complaint" against Gore. *First National Bank & Trust Co., Rogers, Ark. v. Hollingsworth, et. al.,* 701 F.Supp. 701 (W.D.Ark.1988) (emphasis added). On the basis of the courtroom proceedings and the subsequent order, Gore

issue of pendent jurisdiction if the district court had disposed of the RICO claim on a motion for summary judgment prior to trial. *Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). However, although early dismissal

of a federal claim is indeed a factor tending to support dismissal of an accompanying state claim, this factor is not determinative. *Koke v. Stifel, Nicolaus & Co.,* 620 F.2d 1340, 1346 (8th Cir.1980).

concluded that she was no longer a party to the litigation.

One week later, the district court conducted a hearing to consider the evidence entered during the jury trial as it related to the fraudulent transfer claims, and to receive any additional evidence the parties had to offer regarding these claims. Gore, having had "all claims" against her dismissed, did not participate in the subsequent hearing, nor did the district court or any adverse party provide her with notice of the time and place of the hearing. On December 21, 1989, the district court issued a memorandum opinion addressing the fraudulent transfer claims. In the memorandum, the district court stated that it would enter an order and judgment against Gore in the amount of $9,900 as a recipient of fraudulently transferred CHM funds in September 1988. The district court formally entered the final order on January 26, 1990. Gore now contends that the second order has no effect because the district court did not have jurisdiction over her once it dismissed "all claims" against her in its first order.

The record clearly discloses that the district court had entered a formal judgment dismissing all claims against Gore. Neither the district court, acting *sua sponte*, nor First National, filed a motion for a new trial or a motion to amend the judgment. *See* Fed.R.Civ.P. 59. Without such a motion, the district court lacked the authority to set aside the previously entered judgment and to enter a new judgment in its place. Thus, the initial judgment dismissing "all claims" against Gore must stand.

We therefore direct the district court to set aside the subsequent judgment as null and void.

### E. Motions for Rule 11 Sanctions

 Lorene Hollingsworth and Don and Judy Gore appeal the district court's denial of their separately filed motions for attorneys fees pursuant to Fed.R.Civ.P. 11.[10] They argue that the directed verdict in favor of the Gores and the jury verdict absolving Lorene Hollingsworth of all liability clearly indicate that First National's allegations were not "well grounded in fact" and suggest that First National failed to make a "reasonable inquiry" prior to filing its complaint against them. Fed.R. Civ.P. 11. We review the district court's Rule 11 determinations only for abuse of discretion. *Cooter & Gell v. Hartmarx Corp.*, —— U.S. ——, ——, 110 S.Ct. 2447, 2461, 110 L.Ed.2d 359 (1990); *Crookham v. Crookham*, 914 F.2d 1027 (8th Cir.1990).

The relationship and proximity of Lorene Hollingsworth and the Gores to the activities of Swanson, A.L. Hollingsworth and CHM brought them clearly within the orbit of the fraud scheme. The complexity and subterfuge attending the underlying RICO transactions and fraudulent conveyances made it difficult to determine in advance of trial whether Lorene Hollingsworth and the Gores were, in the words of the district court, the "cons" or the "conned." Under these circumstances, the district court determined that First National had not interposed its claims either in bad faith, or

---

**10.** In their brief on appeal, the Gores requested that we remand to the district court for a ruling on their motion for fees and costs for discovery irregularities pursuant to Fed.R.Civ.P. 30(g)(2). The district court never ruled on the Rule 30(g)(2) motion, nor did the Gores ever directly ask the district court for a ruling on their motion. The Gores submitted neither an affidavit nor any kind of documentation in support of their motion regarding the expenses they claimed to have incurred because of the alleged discovery irregularities. They appear to have freshened their request for compensation for the discovery costs in their Rule 11 motion. The Gores submitted documentation of the needlessly incurred discovery expenses for the first time in their affidavit in support of their

Rule 11 motion. At oral argument, counsel for the Gores suggested that we should treat the Rule 30(g)(2) motion as consolidated into the Rule 11 sanctions motion.

To the extent that the Gores may be seeking individual consideration of Rule 30(g)(2), we instruct them to direct their request to the district court which can correct its oversight under Fed.R.Civ.P. 60(a). *See Saffold v. McGraw-Edison Co.*, 566 F.2d 621 (8th Cir.1977). In the absence of a ruling from the district court, we, as a reviewing court, lack authority to consider any aspects of the Rule 30(g)(2) motion. *Id.* We therefore analyze the Gores' request for costs and fees associated with the allegedly irregular discovery strictly under a Rule 11 posture.

without reasonable investigation or basis. We agree. Thus, we hold that the district court did not abuse its discretion and affirm its denial of sanctions.

### III. CONCLUSION

For the reasons expressed above, we vacate the RICO judgment against A.L. Hollingsworth and remand the RICO claims against him for further proceedings consistent with this opinion. We also vacate the fraudulent transfer judgment against Judy Gore as improper and direct the district court to set aside the subsequent order entered upon it. We affirm the judgment of the district court in all other respects.