_____

No. 95-1177EM
_____

Dimitri Yannacopoulos,             *
                                   *
          Appellant,               *   On Appeal from the United
                                   *   States District Court
     v.                            *   for the Eastern District
                                   *   of Missouri.
General Dynamics Corporation,      *
                                   *
          Appellee.                *

                       _____

          Submitted:  November 16, 1995

             Filed:  February 9, 1996
                       _____

Before RICHARD S. ARNOLD, Chief Judge, HENLEY, Senior Circuit
     Judge, and FAGG, Circuit Judge.
                       _____

RICHARD S. ARNOLD, Chief Judge.


     General Dynamics Corp. (GD) and Dimitri Yannacopoulos, a Greek
citizen, entered into a consulting agreement under which
Yannacopoulos worked as a consultant on the sale of defense and
non-defense GD products outside the United States.  A dispute
regarding the amount and type of payment due Yannacopoulos arose,
and he filed this six-count lawsuit in the United States District
Court for the Eastern District of Missouri.[1]  GD filed a three-
count counterclaim alleging, inter alia, that Yannacopoulos had
broken his contract.  The jury returned a verdict in favor of GD on

_____

     [1]The Hon. Donald J. Stohr, United States District Judge for
the Eastern District of Missouri.

each of Yannacopoulos's six claims, and on GD's breach of contract claim. (The jury, however, awarded no damages to GD on this last claim.) On appeal, Yannacopoulos challenges numerous evidentiary rulings, the instructions given to the jury, and the failure of the Court to investigate alleged juror misconduct. We affirm.

I.

Yannacopoulos's relationship with GD spanned several years beginning in June of 1977. Initially, Yannacopoulos helped GD's telecommunications subsidiary, Stromberg-Carlson, market its commercial telephone equipment in Greece. In return, Stromberg-Carlson agreed to pay Yannacopoulos a monthly consulting fee and commissions based on the sale of equipment.

In 1979, Yannacopoulos expanded his consulting services to include the shipbuilding division of GD. As a result, GD and Yannacopoulos executed a written contract effective from November 1, 1979, through October 31, 1981. Under the terms of this contract, GD would pay Yannacopoulos $10,000 per month, and Yannacopoulos would provide consulting services relating to telecommunications and shipbuilding. Beginning in October of 1981, GD began to extend Yannacopoulos's contract on a month-to-month basis. This practice continued until March of 1982, when GD extended Yannacopoulos' contract to October of 1983 with a $4000.00 per month pay increase.

In June of 1992, GD found its F-16 fighter plane on a short list of military equipment being considered for purchase by the Greek government. Greece eventually agreed to purchase 40 F-16's from GD for $616,497,013. The Greek government also purchased the Stinger and Phalanx from the United States in 1986 and 1987. Based on these military sales, Yannacopoulos asserted a right to over $39,000,000 in commissions. GD refused to pay.

The amount and form of payment GD agreed to pay Yannacopoulos for his expanded duties as a consultant are the subject of this litigation. Yannacopoulos contends that GD, through a series of oral and written promises, agreed to pay him commissions for his services. He also contends that he was active in the marketing of the F-16, Phalanx, and Stinger to the Greek government; and that his contract extended beyond October of 1983. GD, on the other hand, contends that Yannacopoulos was never promised commissions for his work as a consultant beyond those associated with his Stromberg-Carlson contract; that he was not a member of the F-16, Phalanx, or Stinger marketing teams; and that his contract expired in October of 1983.

The dispute led Yannacopoulos to file this action against GD in December of 1989. He claimed that GD was liable for: 1) breach of contract; 2) unjust enrichment; 3) promissory estoppel; 4) fraud; and 5) tortious interference. GD counterclaimed alleging: 1) breach of contract; 2) fraud; and 3) violations of the Racketeer Influenced & Corrupt Organizations Act, 18 U.S.C. §§ 1961-68 (RICO). After a six-week trial, the jury returned a verdict against Yannacopoulos on each of his claims, and in favor of GD on its breach-of-contract claim. Yannacopoulos appeals and requests that the judgment be reversed and a new trial granted due to errors made by the Court.

II.

First, Yannacopoulos argues that the District Court committed numerous evidentiary errors, including the exclusion of certain evidence offered by him in support of his claims. We review a district court's decision to exclude evidence for abuse of discretion. Banghart v. Origoverken, A.B., 49 F.3d 1302, 1304 (8th Cir. 1995). We will reverse only if the abuse is clear, and if the parties' substantive rights are affected. Ibid.

Yannacopoulos alleges that two pieces of evidence critical to his tortious-interference claim were erroneously excluded. First, he cites the Court's failure to admit the 1982 legal opinion[2] of a Greek lawyer, Gregory Mourgelas, who was employed by GD. He alleges that a letter from Mourgelas to Veliotis, a GD executive, demonstrates that GD "repudiated its promises to pay [him] commissions or commission-equivalents knowing full well that it was legally obligated to do so."

We do not see how the exclusion of this evidence could be considered an abuse of discretion given the posture of this case. The key issue during the trial was whether or not a contract, express or implied, existed between Yannacopoulos and GD which required GD to pay Yannacopoulos commissions or commission equivalents. Contrary to Yannacopoulos's claims, the letter which was excluded was not evidence that a contract for commissions existed. Rather, the letter was a conclusory statement of a legal opinion by Mourgelas.

It was the role of the jury to consider the evidence presented and draw its own conclusions regarding the existence of a contract

---

[2]In May of 1982, P.T. "Taki" Veliotis obtained a legal opinion from a Greek lawyer, Gregory Mourgelas. Yannacopoulos points to the following language in Mourgelas's letter to Veliotis:

> 6. Indeed, . . . a side agreement exists . . . and has been concluded by two telexes . . . these two telexes exchanged in the form of an agreement stipulated that a commission should be paid to [DIMITRI] in any case, as long as one of its active projects would be finalized; the commission schedules however would be negotiated on a step by step basis with the competent Divisions of GD.

Appellant's brief at 40-41.

for commission.  The letter, which addressed the ultimate issue regarding Yannacopoulos's compensation, would have served only to usurp the jury's role as factfinder.  Given these circumstances, the letter was properly excluded.

Second, Yannacopoulos argues that it was error for the Court to exclude evidence of an alleged "bait-and-switch" scheme employed by GD.[3]  To establish the existence of this scheme, Yannacopoulos sought to introduce evidence regarding the make-up of an offset plan which was essential to the sale of F-16's to the Greek government.  ("Offset," in this context, means a reciprocal obligation assumed by GD - for example, to do a certain amount of business in Greece.)  He also sought to introduce evidence demonstrating that an investment plan was later substituted for the original offset plan; and that the substitute plan was of de minimis value when compared with the original plan.  This evidence, he claims, would have established that his discharge was necessary for the scheme's success.

It is unlikely that the admission of this evidence would have had a substantial positive effect on Yannacopoulos's case.  In order to succeed on his tortious interference claim, Yannacopoulos had to demonstrate that he had a contract for commissions or a business expectancy of the same.  See Rolscreen Co. v. Pella Products of St. Louis, Inc., 64 F.3d 1202, 1207 (8th Cir. 1995)

---

[3]The bait, Yannacopoulos alleges, was a multi-billion dollar offset package which he helped to negotiate designed to induce the Greek government to purchase F-16's from GD.  The switch, Yannacopoulos claims, was the substitution of a valueless plan for an "offset development company" instead of the original offset plan.  According to Yannacopoulos, in order for the bait-and-switch scheme to succeed, it was necessary for GD to remove him from the negotiation.  Yannacopoulos cites his knowledge that the offset development company was valueless to the Greek government and his commitment, as a Greek patriot, to a plan that would help the Greek people as the basis for GD's desire to exclude him from negotiations.

(noting that a contract or valid business expectancy is an essential element of a tortious-interference claim under Missouri law). Evidence related to the bait-and-switch scheme allegedly employed by GD does not support Yannacopoulos's claim that a contract for commissions existed, or that he had an expectation of receiving commissions.

Establishing that a bait-and-switch scheme was employed could suggest only that, if a contract existed, GD needed to break its contract with Yannacopoulos in order to carry out its scheme. The jury, however, concluded that no contract for commissions existed, making evidence of attempts to break a contract irrelevant. Exclusion of evidence which is substantively irrelevant is not an abuse of discretion. Fleming v. Harris, 39 F.3d 905, 908 (8th Cir. 1994).

## III.

Yannacopoulos also argues that the District Court's denial of his motion for judgment as a matter of law on GD's contract, RICO, and fraud counterclaims was error. A motion for judgment as a matter of law is a challenge to the sufficiency of the evidence. Commercial Property Invs., Inc. v. Quality Inns Intern., Inc., 61 F.3d 639, 644 (8th Cir. 1995). On appeal, we review the the evidence in the light most favorable to the prevailing party. Ibid. After a careful review of the record, we are persuaded that sufficient evidence was presented by GD on each of its counterclaims to sustain the District Court's denial of Yannacopoulos's motion for judgment as a matter of law. And in any event the jury ruled for Yannacopoulos on GD's RICO and fraud claims.

## IV.

Next, Yannacopoulos claims that the District Court erred by

failing to instruct the jury properly in two instances. First, he argues that the Court erred by refusing to instruct the jury that no United States law barred GD from paying him commissions.[4] Yannacopoulos claims that this instruction was necessary to prevent the jury from being misled by GD into thinking that payment of commissions was illegal. The District Court chose not to give the proposed instruction, stating that it was "confusing," and that "the plaintiff has done a pretty good job of establishing" that payment of commissions was not illegal. We believe the District Court committed no error in this respect.

Second, Yannacopoulos claims it was error for the District Court to refuse to instruct the jury on the definition of

_____

[4]Yannacopoulos proposed the following instruction:

> You have heard testimony and other evidence with respect to various provisions of United States law that deal with the payment of commissions on sales of military products by United States companies to foreign companies.

> There is no provision of United States law, nor has there been any such law at any time relevant to this case, that prohibits the payment of such commissions. Instead, United States law requires only that commission payments be disclosed to the United States Government and that no payment in excess of $50,000 be made out of funds provided by the United States Government under its "Foreign Military Sales" program.

> Thus, General Dynamics was free to agree to pay Mr. Yannacopoulos out of its own funds any commission it saw fit, and no United States law bars, or has ever barred, the enforcement of such an agreement.

D.Y. App. at Ex. 114.

-7-

"procuring cause."[5]  According to Yannacopoulos, this instruction was necessary to establish that he was entitled to commissions despite the fact that he "did not sell anything in Greece" while working as a consultant for GD.  He argues that although he was not the seller, he was the procuring cause of later sales by GD in Greece.

We reverse a district court's decision not to give a particular instruction only in cases where "`the requested instruction is correct, not adequately covered by the charge given, and involves a point so important that failure to give the instruction seriously impaired the party's ability to present an effective case.'"  Thomlison v. City of Omaha, 63 F.3d 786, 791 (8th Cir. 1995) (quoting Wood v. President & Trustees of Spring Hill College, 978 F.2d 1214, 1221 (11th Cir. 1992)).  This is not such a case.

The instruction proffered by Yannacopoulos was not a correct statement of Missouri law.  Under Missouri's law, a party is a procuring cause if that party's efforts of bringing together purchasers "`have set in motion a series of events which, without break in the continuity and without interruption in negotiations, eventually culminates in the sale.'"  Williams v. Enochs, 742

---

[5]Yannacopoulos proposed the following instruction:

     Absent a written agreement to the contrary, a party may be entitled to commissions on sales even if made after the termination of a contract, if that party procured the sales through its activities prior to termination, notwithstanding the fact that the sale was consummated by the principal personally or through another agent.

     A party is the procuring cause of a sale if he brings a seller together with a buyer under circumstances conducive to a sale, and the sale actually occurs.

D.Y. App. at Ex. 45.

S.W.2d 165, 167 (Mo. 1987) (en banc) (quoting Staubus v. Reid, 652 S.W.2d 293, 296 (Mo. App. 1983)). The instruction proffered by Yannacopoulos simply stated that "[a] party is a procuring cause of a sale if he brings a seller together with a buyer under circumstances conducive to a sale, and the sale actually occurs." Because this is a misstatement of the law, the instruction was properly refused.

V.

In his final argument, Yannacopoulos maintains that the District Court erred by refusing to allow him to investigate alleged juror misconduct. This claim stems from the jury's written request for a dictionary during deliberation. In response to the request, the jurors were returned to the jury box and instructed that the Court could not provide a dictionary.

As the judge spoke with the jury, however, the court reporter overheard and recorded a juror stating: "I'll look up that word in the dictionary tonight." GD App. at 841. Following this statement by the juror, the judge admonished the jury as follows:

> The other thing that I want you to be sure, be careful and remember my earlier instructions, and that is not to do any investigation on your own, not to do any independent research or anything like that because that could basically cause a problem with the whole jury. Just what you're confined to, basically, is what you have in front of you and your own common sense.

Id. at 842. The jury was then excused until the following morning and the judge informed the attorneys of the statement made by the juror. Yannacopoulos made no objection.

The next morning, the Court again admonished the jurors

-9-

against the use of extrinsic reference materials:

> With respect, as I explained to you about the dictionary thing yesterday, I probably should have expanded a little bit on that. The reason that the Court doesn't allow dictionaries and so forth in jury rooms is because frequently the terms that appear in a regular dictionary have different definitions from the legal terms. It's kind of like, you know, lawyers have a way of defining certain things, just like the government does and it's usually a lot longer and a lot more complicated than what appears in the standard dictionary and the lawyers, unfortunately, it's the Court's law that you must be bound by as opposed to whatever but you can use your common sense as to words, so that's the reason, . . ..

Id. at 844-45.  Again, Yannacopoulos made no objection, and the jury was allowed to deliberate until reaching a verdict.

It was not until several days later that Yannacopoulos moved the Court, pursuant to Local Rule 16(D) of the Local Rules of the Eastern District of Missouri,[6] for leave to interview the jurors in order to determine whether or not a dictionary had been consulted. D.Y. App. at Ex. 119.  The District Court denied the motion. Yannacopoulos now claims that the Court was required, under Local Rule 16(D), to hold a hearing to unearth alleged juror misconduct.

---

[6]Local Rule 16(D)(2) provides in relevant part:

> In any case where misconduct of one or more petit jurors is suspected and supported by evidence obtained by a lawyer or a party, the Court shall grant leave to the lawyer, after such fact is communicated to the Court, to make such investigation as the Court deems appropriate to establish the truth or lack of truth of the suspected misconduct of such petit juror or jurors.

As an initial matter, we note that Yannacopoulos failed to object to the admonitions given by the Court, or to the continuation of jury deliberation. He made no request to voir dire the jury panel, or to question the juror who made the statement. Instead, Yannacopoulos waited until after the verdict was returned to raise this issue.

When a party waits until the end of a case to complain of juror misconduct, as Yannacopoulos did, the objection is waived, Rowe Intern., Inc. v. J-B Enters., Inc., 647 F.2d 830, 836 (8th Cir. 1981), and we will reverse the District Court only if it has committed plain error. First Nat. Bank and Trust Co. v. Hollingsworth, 931 F.2d 1295, 1305 (8th Cir. 1991). Plain error is error which has a serious effect on the fairness of the proceedings. Ibid.

This is not the first time we have been confronted by the issue of jurors consulting a dictionary. In previous cases, we have held that prejudice to a party could not be presumed from the use of a dictionary by the jury. Harold v. Corwin, 846 F.2d 1148, 1151 (8th Cir. 1988) (trial judge read requested definition to jury from dictionary); United States v. Cheyenne, 855 F.2d 566, 568 (8th Cir. 1988). We then focused our review in each case on the facts surrounding the incidents to determine whether or not the use was prejudicial, and whether or not the incident was properly handled by the District Court. See e.g., Fink v. Foley-Belsaw Co., 983 F.2d 111, 113 (8th Cir. 1993); Cheyenne, 855 F.3d at 568. We think the same approach is appropriate here.

In this case, the Court admonished the jury twice regarding the use of extrinsic reference materials, giving specific attention to the impending infraction of consulting a dictionary. Yannacopoulos adduced no evidence that the juror actually ignored the judge's instruction and consulted a dictionary. Given these facts, we do not view the Court's use of preemptive admonitions as

plain error.  It is certainly reasonable to believe, absent evidence to the contrary, that the jury adhered to the judge's instructions.  See Hrzenak v. White-Westinghouse Appliance Co., 682 F.2d 714, 720 (8th Cir. 1982).

Further, we cannot agree with Yannacopoulos's claim that a hearing was required under Local Rule 16(D).  We note that "the `application of local rules is a matter peculiarly within the district court's province.'"  Chrysler Credit Corp. v. Cathey, 977 F.2d 447, 449 (8th Cir. 1992) (per curiam) (quoting Reyher v. Champion Int'l. Corp., 975 F.2d 483, 489 (8th Cir. 1992)).  That is particularly true in cases involving juror misconduct, since every allegation of juror misconduct does not require an evidentiary hearing, see Robinson v. Monsanto Co., 758 F.2d 331, 334-35 (8th Cir. 1985), and the district court is in the best position to determine when a hearing is necessary.  In this case, the District Court concluded - on the basis of the evidence presented by Yannacopoulos and the nature of the alleged misconduct - that it was not necessary to unsettle the verdict by conducting a hearing. This decision was not plain error.

The judgment is affirmed.

A true copy.

        Attest:


        CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.