# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

———————

No. 03-2989/03-3965

———————

United States of America,

      Appellee,

v.

Michael Sean Gianakos,

      Appellant.

\*
\*
\*
\*
\* Appeals from the United States
\* District Court for the
\* District of North Dakota.
\*
\*
\*

———————

Submitted: May 10, 2004
Filed: April 21, 2005

———————

Before LOKEN, Chief Judge, BRIGHT, and SMITH, Circuit Judges.

———————

SMITH, Circuit Judge.

A federal jury found Michael Sean Gianakos guilty of kidnapping with death resulting, in violation of 18 U.S.C. § 1201(a)(1). The district court[1] sentenced him to life imprisonment. Michael appeals his conviction on numerous grounds: (1) the district court should not have admitted his state-court testimony at trial; (2) the court erred in refusing to instruct the jury with regard to the offense of accessory after the fact and granting him a new trial; (3) the district court erred in failing to adequately address juror misconduct; (4) the court abused its discretion by excluding certain

———————

[1]The Honorable Patrick A. Conmy, United States District Judge for the District of North Dakota.

audiotapes; and (5) the evidence was insufficient to convict him. For the reasons discussed below, we affirm Michael's conviction.

I. *Facts*

The following facts are based on the record evidence, with disputed questions of fact deemed to have been resolved by the jury in a manner that supports its verdict. Michael Gianakos and Jamie Dennis, with their two children, lived in Moorhead, Minnesota. Michael worked at a local motel. In January 1997, Michael and Jamie staged a robbery at the motel and stole cash from the business. While Jamie and Michael committed the robbery, Anne Marie Camp, a neighbor's daughter, watched their children at their home. Two days after the robbery, Anne was interviewed by investigating police officers. During her interview, Anne stated that Jamie had come home on the night of the robbery with a bag of money. Anne also reported that Michael and Jamie celebrated by ordering pizza.

Michael and Jamie married on February 14, 1997. Anne was the couple's maid of honor. According to Michael, he married Jamie so the couple could take advantage of Minnesota's spousal-privilege law should they be charged with the motel robbery. The couple was particularly concerned that Jamie would be sentenced to a lengthy prison term if convicted, as she was then on probation for another offense. On February 27, 1997, Michael and Jamie were charged with robbery.

On May 1, 1997, Anne's mother reported her missing to the police when Anne failed to attend church with her. A few days later, Anne's body was found near a rural farmhouse outside of Moorhead. She had been shot in the head and her throat was cut. Eight days after Anne was reported missing, on May 9, 1997, Michael entered a plea of guilty to the staged robbery and was sentenced to sixty days' confinement. Jamie was found guilty by a jury.

On September 7, 1998, over a year after Anne's body was found, Michael's parents contacted the local police and informed them that they had information about Anne's murder. Michael's parents told the police that they had received a telephone call from Michael who claimed to have read the details of Anne's murder in one of Jamie's diaries. According to Michael's parents, the diary stated that Anne had been shot, her throat cut, and that she had been given sleeping pills before she was murdered. The parents also stated that the diary provided that latex gloves were used. At that point in time, the fact that Anne's throat had been cut had not been publicly disclosed. Furthermore, law enforcement was unaware that Anne had been given sleeping pills. Based on Michael's parents' statements to police, a search warrant was issued for Michael's residence.

During the execution of the search warrant, Michael informed the officers that he could not locate the diary. The officers found a number of journals and notebooks that Jamie had written in, but there were no writings found in the house that described the details Michael shared with his parents. Consequently, Michael and Jamie became the focus of the investigation.

On June 11, 1999, Jamie's probation was revoked and she was sent to the Shakopee State Prison for her role in the January 1997 staged robbery. While incarcerated, all of Jamie's telephone conversations were recorded. On September 15, 1999, law enforcement obtained permission for a wiretap on Michael's telephone.

On October 21, 1999, Linda Bay, an inmate at the Shakopee State Prison, called the Clay County Sheriff's office and stated that she had information on Anne's murder. Bay collected a $2,000 reward. According to Bay, Jamie said that Michael purchased a 12-gauge shotgun on May 1, 1997, at the pawn shop across the street from their apartment. Michael represented to the investigators that he had purchased the shotgun because Jamie wanted it for security during the time of Michael's

incarceration. Michael and Jamie purchased shells for the gun. They also purchased gin and a package of wine coolers from a liquor store.

According to Bay, Jamie thought that she and Michael only intended to scare Anne to prevent her from testifying against Jamie about the motel robbery. Jamie described the murder to Bay and stated that both of Jamie's daughters were present at the time of the murder. On the night of the murder, the couple picked up Anne and told her that there was a farmhouse that Michael and Jamie were thinking about purchasing and invited her along to see it with them. As they were driving, Jamie handed Anne a wine cooler contaminated with a toxic level of sleeping pills.

When the group arrived, Jamie, Anne, and the children went into the farmhouse to look around. Michael remained outside. Once inside, the sleeping pills began to take effect on Anne and she became "fuzzy." One of the children became irritated, so Jamie decided to return to the car. While walking back to the car, Jamie noticed that the trunk was open. Jamie said that she turned around and watched Michael shoot Anne in the back of the head. Michael instructed Jamie to help him drag Anne's body–weighing approximately 225 pounds–behind the old farmhouse. After Jamie and Michael dragged the body face down behind the house, Michael then shot Anne in the face so that she could not be recognized and cut her throat.

Michael instructed Jamie to get into the car but not to start it. Jamie went to the car, closed the trunk, and got into the driver's seat. When Michael returned to the car, Jamie stated that Michael yelled at her for closing the trunk. As to the murder weapon, Jamie stated that Michael destroyed it by cutting it up and filing it down to little pieces. After returning home, Michael went over to his parents' home. Michael called Jamie from his parents' home and told her that he had gone back to the farmhouse and picked up anything that could be traced to them, including the shells. However, a latex glove was found at the crime scene.

Jamie had taken Anne's car and house keys out of Anne's pocket. Michael told Jamie that she needed to go into Anne's house and get Anne's purse. Michael also told Jamie that they needed to make it look like Anne left the apartment willingly. Anne's purse was found in a ditch approximately one mile from the crime scene.

Based upon the incriminating evidence obtained from the wiretaps and from Bay, a Minnesota grand jury indicted Michael for first-degree murder. Jamie cooperated with police and entered a guilty plea to second-degree murder. During Michael's state trial, Jamie testified against him in a manner consistent with the story she told Bay, thus implicating them both in Anne's murder.

Michael was convicted of first-degree murder in May 2000 and sentenced to life in prison. He then appealed to the Minnesota Supreme Court arguing that his conviction should be reversed because his wife's testimony was admitted at trial in violation of the Minnesota marital-privilege statute, Minn. Stat. § 595.02, subd. 1(a). *Minnesota v. Gianakos*, 644 N.W.2d 409 (Minn. 2002). The Minnesota Supreme Court agreed[2] and reversed his conviction on May 23, 2002. *Id*.

On July 19, 2002, a federal grand jury returned a four-count indictment against Michael, charging him with conspiracy to commit kidnapping with death resulting, in violation of 18 U.S.C. § 1201(c); kidnapping resulting in death in violation of 18 U.S.C. § 1201(a)(1); using or carrying a firearm during a crime of violence in violation of 18 U.S.C. § 924(c)(1); and causing death by use of a firearm in violation of 18 U.S.C. § 924(j)(1).

---

[2]Minnesota chose not to adopt an exception to the Minnesota privilege for either sham marriages or marriages where the spouses are joint participants. *Minnesota v. Gianakos*, 644 N.W.2d 409, 416 (Minn. 2002).

Counts one and three were dismissed by the return of a two-count superseding indictment against Michael. Michael entered a plea of not guilty to the superseding indictment. A jury found Michael guilty of kidnapping resulting in death. The jury was unable to reach a verdict on the charge of causing death by use of a firearm. The district court sentenced Michael to life imprisonment. Michael now appeals his convictions on the issues set forth below.

## II. *Discussion*
### A. *Harrison - Use of Prior Testimony*

Michael contends that the district court erred in admitting his testimony from his prior state trial. At the state trial, Jamie testified for the state against Michael. Michael took the stand in his own defense to rebut Jamie's testimony. Michael opposed the introduction of his prior testimony in a motion in limine. He contended that introduction of his state trial testimony violated his Fifth Amendment right against self-incrimination. We disagree.

The Fifth Amendment, in pertinent part, states that "No person . . . shall be compelled in any criminal case to be a witness against himself . . . ." U.S. CONST. amend. V. This Amendment protects an individual's constitutional privilege against self-incrimination. This privilege is designed to prevent the use of the legal process to force from the lips of an accused individual, evidence necessary to convict him. *United States v. White*, 322 U.S. 694 (1944). However, once the right against self-incrimination is waived, the information given is admissible at any subsequent trial. *Hendrickson v. Norris*, 224 F.3d 748, 751 (8th Cir. 2000); *United States v. Duchi*, 944 F.2d 391, 395–96 (8th Cir. 1991); *United States v. Houp*, 462 F.2d 1338, 1340 (8th Cir. 1972).

In support of his argument, Michael relies on *Harrison v. United States*, 392 U.S. 219, 222 (1968), but his reliance is misplaced. In *Harrison*, the United States Supreme Court held that a defendant's former trial testimony was not admissible into

evidence at a subsequent trial because it was the effect of an illegally obtained confession. *Id.* The Court reasoned that the question for the trial court is whether the defendant's trial testimony was in fact impelled by the government's wrongful use of his illegally obtained confession. *Id*. at 224. Because the circumstances indicated that the defendant's original trial testimony had been offered to counteract the confessions, the Court held that the defendant's testimony at his first trial was itself the tainted "fruits" of the illegally obtained confession. *Id*. at 223–26.

This case is not analogous to *Harrison*. Michael's state trial testimony, admitted in his subsequent federal trial, was not the fruit of an illegally obtained confession. Michael testified in his own defense to rebut his wife's testimony implicating him in the murder. Her testimony–which proved to be inadmissible under state law–was not illegally obtained, and hence was not constitutionally suspect. Michael may have determined that his testimony was strategically necessary for his defense, but it was not because the government had illegally obtained evidence in violation of his constitutional rights.[3]

A district court's decision denying a motion in limine is reviewed for an abuse of discretion. *United States v. Whitehead*, 176 F.3d 1030, 1036 (8th Cir. 1999). We conclude that the district court did not abuse its discretion in denying Michael's motion in limine and allowing Michael's state trial testimony to be introduced at his subsequent federal trial. The *Harrison* exception does not apply to these facts.

---

[3]Michael contends that *People v. Duncan*, 527 N.E. 2d 1060, 1062 (Ill. Ct. App. 1988), stands for the proposition that a court must consider why the defendant took the stand at the earlier proceeding in order to determine whether his testimony may be used at the second trial. This non-controlling precedent is also non-persuasive. The defendant's statements in that case were excluded because the defendant's decision to testify was not voluntarily and knowingly waived due to ineffective assistance of counsel. *Id.*

## B. *Jury Instructions*

Next, Michael argues that the district court erred by failing to instruct the jury on the offense of accessory after the fact.[4] Michael contends that his defense theory postulated that he was not involved in Anne's kidnapping, and was at most, an accessory after the fact. He argues that the jury could have found that he was not involved with Anne's murder, but did knowingly assist Jamie in concealing her commission of the crime. In response, the government contends that Michael's defense theory was that Jamie committed the murder with Andrew Betrosian. The government argues that Michael never admitted to helping Jamie conceal her commission of the murder.

We review a district court's decision to grant or deny a request for a particular jury instruction for abuse of discretion. *Whitehead*, 176 F.3d at 1037. A district court has broad discretion in instructing the jury, and jury instructions do not need to be technically perfect or even a model of clarity. *Mems v. City of St. Paul, Dep't of Fire and Safety Servs.*, 327 F.3d 771, 781 (8th Cir. 2003). We determine "whether the instructions, taken as a whole and viewed in the light of the evidence and applicable law, fairly and adequately submitted the issues in the case to the jury." *Id.* (quoting *Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.*, 254 F.3d 706, 711 (8th Cir. 2001)). A defendant is entitled to an instruction explaining his defense theory if the request is timely, the proffered instruction is supported by the evidence, and the instruction correctly states the law. *United States v. Wiggins*, 104 F.3d 174, 176 (8th Cir. 1997). We will reverse a conviction only upon a finding that the district court's instructional error to give a particular instruction was prejudicial to the parties. *White v. Honeywell, Inc.*, 141 F.3d 1270, 1278 (8th Cir. 1998) (internal quotations omitted); *Whitehead*, 176 F.3d at 1037.

---

[4]"An accessory after the fact is an offense where one knowing that an offense has been committed, receives, relieves, comforts or assists the offender in order to hinder his or her apprehension, trial or punishment." *United States v. Brown*, 33 F.3d 1002, 1004 (8th Cir. 1994) (internal quotations omitted).

Based upon our review of the record, we hold that Michael did not preserve the jury instruction issue for appeal. Michael states that he made a timely request for the instruction. However, the record on appeal does not contain the entire package or any document revealing when those proposed instructions were submitted to the district court. An examination of the transcript reveals Michael did not adequately object to the instruction given by the district court. Michael's counsel had the following colloquy with the court:

> THE COURT: I understand. Have you had a chance to look over my proposed instructions?
>
> MR. HENDERSON [defense counsel]: Yes, Your Honor. We have some comments about the instructions on aiding and abetting.
>
> THE COURT: . . . But, in all events, you'll be ready to point out the error of my ways to me sometime tomorrow.
>
> MR. MYERS [the prosecutor]: Yes, Your Honor.
>
> MR. HENDERSON: Yes, Your Honor.
> And, Your Honor, the one thing I would like to just call to your attention is that we will be asking very strongly for that instruction about other crimes; that he cannot be convicted of aiding and abetting for actions taken after the fact. I think that's extremely important in this case.
>
> . . . [T]he evidence against him is evidence of concealment -- it's not evidence of committing the crime -- and that the risk that he could be convicted for actions taken after the fact is too great. I think the jury has to be advised that actions after the fact do not constitute aiding and abetting. I think it's a fair instruction on the law, and I think it's really necessary in this case to get a just outcome.

The next morning, the district court distributed its proposed final instructions. The colloquy on the aiding and abetting instruction continued. The court specifically addressed Michael's request stating:

> And I know Mr. Henderson has made a rather impassioned plea that we should clearly state that committing a crime a year later of obstruction of justice cannot be considered as proof of aiding and abetting at the time of the commission of the crime. *And that's why we have incorporated the language "before or during the commission of the offense" to cover that concern and that fear.*

(Emphasis added.)

Michael did not object to the court's revised instruction addressing his concern about conduct following the offense. In the absence of an objection, we review the relevant instructions for plain error. *United States v. Pinque*, 234 F.3d 374, 377 (8th Cir. 2000). Plain error is absent on this issue. "We regularly instruct juries that a person may be found guilty of aiding and abetting if, *before or at the time the crime was committed,* he knew the offense was being committed . . . ." *United States v. Delpit*, 94 F.3d 1134, 1151 (8th Cir. 1996) (emphasis in original). The district court's instruction followed the controlling Eighth Circuit precedent.

The court's instruction also gave defense counsel an explicit invitation to argue in closing that the jury should acquit because Michael was only guilty of helping or encouraging Jamie to cover up the crime long after it happened. Counsel could have effectively made the accessory-after-the-fact argument based upon the instructions given. The district court did not plainly err in refusing to give an additional instruction.

-10-

## C. *Jury Misconduct and Biased Juror*

For his third point on appeal, Michael argues that the district court failed to adequately investigate potential juror misconduct. We review the district court's handling of allegations of juror misconduct for an abuse of discretion. *United States v. Caldwell*, 83 F.3d 954, 955 (8th Cir. 1996). The alleged incident of juror misconduct in this case involves an intrajury statement overheard by a nonjuror during the government's presentation of the evidence. Detective Brian Green reported that he observed one juror, Skjoldal, silently mouth to another juror, McGregor, "he's guilty."

In order to protect a defendant's Sixth Amendment right to a fair trial as well as his or her due process right to place the burden on the government to prove its case beyond a reasonable doubt, a jury must refrain from premature deliberations in a criminal case. *In re Winship*, 397 U.S. 358, 364 (1970). At a trial's beginning, judges typically admonish juries not to discuss the case among themselves or with anyone else prior to its conclusion. If a jury contravenes that instruction, it is not a light matter. A legitimate concern that a juror's impartiality is suspect cannot be ignored. "Matters which come to the attention of the trial judge after trial has commenced which may affect impartiality on the part of a juror or jurors command careful consideration." *United States v. Rowell*, 512 F.2d 766, 768 (8th Cir. 1975).

Jurors should clearly abstain from communicating to one another about a case before instructed to begin deliberations by the trial court. However, when there are premature deliberations among jurors with no allegations of external influence on the jury, the proper *process* for jury decision making has been violated, but there is no reason to doubt that the jury based its ultimate decision only on evidence formally presented at trial. *See United States v. Evans*, 272 F.3d 1069, 1078–79 (8th Cir. 2001); *Caldwell*, 83 F.3d at 956 (citing *United States v. Resko*, 3 F.3d 684, 690 (3d Cir. 1993). The appellant must show prejudice.

-11-

Michael contends that the district court erred by not determining whether he had been prejudiced by the alleged premature deliberations between Skjoldal and McGregor. When the court was put on notice of the potential misconduct, it summoned the parties. The district court assessed the nature and extent of the jurors' premature discussions. The court noted that this "was not a matter of great significance" and that it would inform the jury that engaging with "other jurors in a discussion of the case . . . would be inappropriate." The court admonished the jury:

> Don't talk about the case or anyone connected with it until I finally chase you off to the jury room to decide the matter. And if, based on the testimony you've heard so far, any one of you has reached a conclusion as to guilt or innocence and decided that there's no way that can be shaken, if that's happened, don't share it with anybody, unless and until you finally get into the jury room to decide the case . . . .[5]

Michael did not object to the court's admonition nor did he move for a mistrial. Because no objection was made, we review for plain error.

The trial judge is in a better position than our court to observe the impact of premature jury discussions of guilt, and to make a considered judgment as to the effectiveness of a cautionary instruction. *Resko*, 3 F.3d at 690. The court also acted consistent with the request of the defendant to instruct the jury not to prematurely deliberate and to report anyone among them who did. Given these facts, we hold that the district court did not commit plain error in choosing not to inquire further into the alleged juror misconduct or to order a mistrial *sua sponte*. The district court acted within its broad discretion in finding that the juror's alleged misconduct was

---

[5]We acknowledge that the district court's admonition did not accurately state the law. An accurate statement of the law would have instructed the jury not to reach a conclusion until all the evidence was presented. However, the instruction was sufficient to achieve its principal aim, which was to remind jurors not to prematurely discuss the case among themselves.

-12-

insufficient to merit further investigation. *See United States v. Williams*, 77 F.3d 1098, 1100 (8th Cir. 1996).

In addition, Michael argues that the district court erred in denying his motion to remove juror Skjoldal, the juror suspected of mouthing to another juror that Michael was guilty. Rule 24(c) of the Federal Rules of Criminal Procedure provides that alternate jurors shall replace jurors who "become or are found to be unable or disqualified to perform their duties." The decision to excuse a juror for cause and substitute an alternate is vested in the district court's discretion, and will be upheld if the record shows a legitimate basis for the court's decision. *United States v. Campbell*, 845 F.2d 782, 785 (8th Cir. 1988).

The Sixth Amendment guarantees the right to trial "by an impartial jury." We presume impartiality "so long as the jurors can conscientiously and properly carry out their sworn duty to apply the law to the facts of the particular case." *United States v. Evans*, 272 F.3d 1069, 1078 (8th Cir. 2001) (quoting *Lockhart v. McCree*, 476 U.S. 162, 184 (1986)). "[I]n federal criminal cases, we will not overturn the district court's finding that a prospective juror can put aside any pretrial opinion and render a verdict based upon the evidence at trial 'unless the error is manifest.'" *United States v. Blom*, 242 F.3d 799, 805–806 (8th Cir. 2001).

After the close of the evidence, and based upon the same incident recounted previously, Michael moved that juror Skjoldal be removed and replaced with an alternate juror due to bias, or, in the alternative, a mistrial. The court responded stating, "It's - - I'm not sure that's what happened. It's what the detective indicated he believed he thought he saw." The court denied both motions without conducting voir dire of juror Skjoldal. The government argues that the fact that the jury deliberated for a full two days and eventually returned a split verdict is a strong indication that the jury deliberated based upon the evidence provided rather than upon

-13-

preconceptions. Michael argues that the record is void of any legitimate basis for the court's decision to allow Skjoldal to deliberate.

The court did not abuse its discretion in refusing to replace juror Skjodal. Even if it was certain that juror Skjoldal mouthed, "he's guilty," this communication was not necessarily prejudicial to Michael. *See Caldwell*, 83 F.3d at 956 (juror comments that "I've heard all of this I need to hear" and "this is just a bunch of crap" insufficient to impeach jury's verdict). Here, Michael produced no evidence of juror Skjoldal holding any prior bias against him. Nor is there any evidence that juror Skjoldal acquired any extrinsic information. Juror Skjoldal made this alleged statement on the fourth day of trial. We have held that there is nothing wrong with a juror being influenced by prior testimony. *Evans*, 272 F.3d at 1079–80. The concern with bias is that a juror will decide a case on the basis of a pretrial predisposition against the interest of a party rather than on the basis of the evidence presented during the trial. Accordingly, the district court did not abuse its discretion in concluding that the incident did not require further action.[6]

---

[6]The dissent makes a three-prong attack on the district court's actions to investigate and remedy the alleged juror misconduct in this case. The dissent argues that the district court erred by failing to investigate the alleged misconduct, giving an erroneous admonition, and then refusing to dismiss the juror at the close of all the evidence. The dissent fails, however, to recognize that these three factual situations are a product of Michael's failure to make timely objections. First, Michael agreed to allow the court to admonish the jury and then accepted the admonition as sufficient. Only at the close of the evidence, four days after the alleged misconduct, did Michael request that Juror Skjodal be removed, or in the alternative, a mistrial. "When a party waits until the end of a case to complain of juror misconduct, . . . the objection is waived, . . . and we will reverse the District Court only if it has committed plain error." *Yannacopoulos v. General Dynamics Corp.*, 75 F.3d 1298, 1304 (8th Cir. 1996) (citations omitted). Contrary to our precedent, the dissent contends that "[Michael's] motion to dismiss juror [Skjodal] or for a mistrial preserved for appellate review the judge's mishandling of juror [Skjodal's] bias at all three stages." As such the dissent has skewed the lens through which we must analyze this case. The

## D. *Evidentiary Issues*

Michael raises several evidentiary issues and argues that each is of sufficient merit to warrant reversal. Specifically, he first alleges that the district court erred in excluding a portion of a recorded telephone conversation with his mother offered by the defense when other portions of the recording had been admitted during the government's case.

While incarcerated, Michael called his mother after receiving a letter from Stacye Parisi, an inmate who met Jamie during her incarceration. He made his mother aware that law enforcement could monitor the call. During the call, Michael described Parisi's letter as stating that Jamie had admitted to lying about Michael's involvement in the crime during her testimony in the state trial. Michael argues that the excluded material would have corroborated his theory that Jamie intended to frame him for the murder. The government made hearsay objections to the admission of Michael's statements to his mother about Parisi's letters. Michael argued that the statements fit the state of mind exception to the hearsay rule. The district court excluded the taped statements as irrelevant. We review a district court's evidentiary decisions under an abuse of discretion standard; however, we will not reverse if an evidentiary error was harmless. *United States v. Walker*, 393 F.3d 842, 848 (8th Cir. 2005) (additionally noting that "[w]e review de novo the district court's interpretation and application of the rules of evidence, and review for an abuse of discretion the factual findings supporting its evidentiary ruling.").

difference between a review for harmless error and plain error is critical; under a harmless error standard the government has the burden of persuasion, whereas under plain error, the defendant bears the burden of persuasion to show the error affected his substantial rights. *United States v. Aikens*, 132 F.3d 452, 455 (8th Cir. 1998) (citing *United States v. Olano*, 507 U.S. 725, 734 (1993)).

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. Relevant evidence is generally admissible, while irrelevant evidence is not. *See* Fed. R. Evid. 402. Our Court will reverse on the basis of an evidentiary ruling only when it "affects the substantial rights of the defendant or when we believe that the error has had more than a slight influence on the verdict." *United States v. Whitehorse*, 316 F.3d 769, 775–76 (8th Cir. 2003) (quoting *United States v. Ballew*, 40 F.3d 936, 941 (8th Cir. 1994) (citations omitted)). Arguably, the statement had some relevance and we find the trial court erred in excluding the tape excerpt on the basis of relevance.

Nonetheless, we can affirm the district court's decision for different reasons. *United States v. Oligmueller*, 198 F.3d 669, 671(8th Cir. 1999); *Sheets v. Salt Lake County*, 45 F.3d 1383, 1390 (10th Cir. 1995) ("We may affirm the district court's evidentiary ruling, despite the fact its conclusion was based on incorrect grounds."). In this case, the district court could have excluded the evidence as hearsay under Fed. R. Evid. 802. The statement at issue in this case is triple hearsay: Michael's statement, Parisi's statement, and Jamie's statement.[7] Accordingly, in order for the statement to be admissible, each part of the combined statement must conform with an exception to the hearsay rule. *See* Fed. R. Evid. 805.

Michael contends that his statement to his mother was properly admissible hearsay as demonstrating his "then existing state of mind." *See* Fed. R. Evid. 803(3). Michael fails, however, to explain what exception applies to either Parisi's or Jamie's statement. Because each part of the combined statement did not conform to the hearsay rule, it was properly excluded. *See* Fed. R. Evid. 805; *United States v. Ortiz*, 125 F.3d 630 (8th Cir. 1997).

---

[7]Without belaboring the point, Michael's testimony was essentially that he said that Parisi said that Jamie said she lied.

The district court's error in determining the evidence to be irrelevant does not require reversal and a new trial. First, the excluded statement was merely cumulative. *See United States v. Johnson*, 1 F.3d 727 (8th Cir. 1993) (holding that exclusion of cumulative evidence is harmless). Specifically, Michael testified to the substance of the conversation, and Parisi testified about the contents of the letter and her personal knowledge of Jamie. Furthermore, the evidence was inadmissable hearsay. Under these circumstances, we cannot say that the district court abused its discretion in excluding Michael's out-of-court statement.

Next, Michael argues that the district court abused its discretion when it limited the defense's cross-examination of Detective Brian Green, concerning the results of polygraph examinations of Andy and Amanda Betrosian regarding their involvement in Anne's murder. A fundamental premise of our criminal trial system is that "the jury is the lie detector." *United States v. Barnard*, 490 F.2d 907, 912 (9th Cir. 1973). "Determining the weight and credibility of witness testimony, therefore, has long been held to be the part of every case that belongs to the jury, who are presumed to be fitted for it by their natural intelligence and their practical knowledge of men and the ways of men." *United States v. Scheffer*, 523 U.S. 303, 313 (1998).[8] "[L]itigation over the admissibility of polygraph evidence is by its very nature collateral . . . . " *Id.* at 314–15. The district court has broad discretion in setting the limits of cross-examination; however, counsel should be given wide latitude. *United States v. Wallace*, 722 F.2d 415, 416 (8th Cir. 1983).

---

[8]"By its very nature, polygraph evidence may diminish the jury's role in making credibility determinations. The common form of polygraph test measures a variety of physiological responses to a set of questions asked by the examiner, who then interprets these physiological correlates of anxiety and offers an opinion to the jury about whether the witness . . . was deceptive in answering questions about the very matters at issue in the trial." *Scheffer*, 523 U.S. at 313.

Detective Green testified that the Betrosians were always consistent. Michael contends that Detective Green's testimony created the impression that the Betrosians were truthful, which opened the door to question Detective Green about the Betrosians' untruthfulness. In a bench conference, defense counsel indicated that it wanted to introduce the results of the Betrosians' failed polygraph tests into evidence. The government objected. The district court excluded the polygraph results finding that admission of the evidence would go to a collateral matter. Michael cross-examined Detective Green's testimony concerning the Betrosians' consistency and could do so adequately without the admission of suspect polygraph results.[9] In addition, Andy Betrosian testified and could have been fully examined before the jury as to his credibility. The district court did not abuse its discretion in excluding the results of the polygraph examinations of Andy and Amanda Betrosian.

Michael next argues that the district court erred in admitting audiotape recordings of conversations he had with Larry Brichem, his cousin. In the conversation, Michael expresses insensitive remarks about the victim. Michael contends that the audiotape was irrelevant, or, if relevant, unfairly prejudicial under Fed. R. Evid. 403, which provides for exclusion of evidence "if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." Michael contends that a particular portion of the conversation should have been excluded as unfairly prejudicial when Michael was expressing his frustration stating:

> I mean sure I feel bad that it happened you know, that somebody did it to her, I feel bad about it but I'm not gonna let it ruin my life, you know what I mean. I didn't know her that well . . . . I hate to be so cold and

---

[9]Before polygraph results may be admitted, the party seeking its admission must lay a proper foundation for the district court to decide its reliability. *United States v. Greatwalker*, 356 F.3d 908, 912 (8th Cir. 2004) (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 592–95 (1993). No such foundation was made in this case.

heartless about it but who gives a shit, it happens everyday. I mean if it was my brother, yet you fuckin right I'd be here screaming up a storm every day of my life probably. You know if it was my brother or my mom or dad.

In response, the government argues that Michael's statement was relevant and probative of consciousness of guilt because he was discussing the babysitter for his children and the maid of honor at his wedding. The district court overruled Michael's objection. We give deference to the district court in making the balancing analysis required by Rule 403. *United States v. Bluebird*, 372 F.3d 989 (8th Cir. 2004). Here, we cannot say the district court abused its discretion. Because we find the district court did not err in admitting the taped statement, we also hold that it was not misconduct for the prosecutor to refer to the statement in his closing argument.

Michael also contends that his conviction was based upon insufficient evidence. Specifically, he notes that at the time he purchased the shotgun–which was the day Anne was murdered–he was scheduled to plead guilty to a robbery offense the following week, and Jamie had requested a gun for home protection while she was alone with the children. He contends Jamie's account of the events that day is incredible and did not rebut his testimony. In sum, Michael argues that there was no evidence that he knew of, or participated in, any kidnapping or that he purchased the gun with the intent that it would be used in Anne's kidnapping.

Our review of the sufficiency of the evidence is limited on appeal. *United States v. Lockett*, 393 F.3d 834, 838 (8th Cir. 2005). We will only reverse a conviction if, "after viewing the evidence in the light most favorable to the jury's verdict, giving the government the benefit of all reasonable inferences that may be drawn from the evidence, no construction of the evidence will support the jury's verdict." *Id*. (citation omitted). We cannot overturn a conviction if a reasonable jury could have found the defendant guilty beyond a reasonable doubt. *Id*.

-19-

The jury viewed all the evidence and determined which evidence to believe or disbelieve. *See United States v. Vesey*, 338 F.3d 913 (8th Cir. 2003) (explaining that it is the jury's job to decide issues of credibility and determine the weight to be accorded to the evidence). Viewed in the light most favorable to the verdict, we hold there was sufficient evidence to support the verdict. First, Michael had been to the rural, abandoned crime scene before the murder. Second, Michael was a partner with Jamie in committing the staged robbery at the Super 8 motel. Michael was upset that Anne would be responsible for sending Jamie to prison based upon the robbery. Third, Michael admitted to purchasing a shotgun and being present when Jamie purchased wine coolers and shotgun shells. Fourth, Michael's alibi statements lacked consistency. Fifth, Michael failed to produce Jamie's diary that he claimed gave him knowledge about the crime that was not revealed to the public.

E. *Motion for a New Trial*

Lastly, Michael argues that the district court should have granted a new trial based upon newly discovered evidence. This evidence consisted of the testimony of a potential witness describing communication with Jamie following her incarceration for Anne's murder. The witness, Michelle Nelson, met Jamie while incarcerated. After the conclusion of the trial, Michael requested a new trial under Rule 33 based upon a statement from Nelson that Jamie told her, "Michael had nothing to do with it." The district court denied the motion finding Nelson's testimony would be cumulative and not likely to lead to acquittal. We agree.

We review a trial court's denial of a new trial motion for abuse of discretion. *United States v. Yerkes*, 345 F.3d 558, 562 (8th Cir. 2003). To obtain a new trial, a defendant must show that: (1) the evidence was not discovered until after the trial; (2) due diligence would not have revealed the evidence; (3) the evidence is not merely cumulative or impeaching; (4) the evidence is material; (5) the evidence is such as to be likely to lead to acquittal. Michael asserts that he discovered Nelson as a potential

witness following the completion of the trial. Apparently, there was no issue below as to whether he could have discovered this witness prior to trial with due diligence. Michael argues that Nelson's testimony would not be merely cumulative because it is exculpatory, showing Michael's lack of involvement in the crime. However, there is no fundamental difference between the testimony of Parisi and that of Nelson. The jury weighed Jamie's credibility, including the possibility that she acted vindictively and untruthfully in accusing Michael of being involved in the crime. Nelson's testimony does not exculpate Michael, but only serves to impeach Jamie's testimony. We therefore agree with the district court that the evidence is not such as would likely lead to acquittal.

## III.

Accordingly, we affirm the judgment of the district court.

BRIGHT, Circuit Judge, dissenting.

I respectfully dissent from the majority's decision as to the juror-misconduct issue. The trial judge erred grossly in allowing jurors to make up their minds before hearing all the evidence.

Faced with a serious and credible allegation that a juror had, in open court, mid-trial, expressed to another juror her conclusion that Gianakos was guilty, the trial judge denied Gianakos' request to investigate that juror's misconduct and any similar misconduct by the other members of the jury. Rather, the judge compounded the problem by indicating to the jurors that they could all make up their minds before hearing all the evidence. Then the judge refused to dismiss the juror who overtly had demonstrated bias against the defendant.

The trial judge erred at all three stages. However, the judge's culminating error makes the proper outcome of this appeal immediately clear: Did the juror's

-21-

expression, midway through the trial, of a premature conclusion as to the ultimate question of guilt or innocence constitute juror bias? On our long-standing and well-reasoned precedent, it did. Has the government shown beyond a reasonable doubt that the trial judge's refusal, over Gianakos' objection, to dismiss a biased juror was harmless? No.

Our duty, then, is clear: The judgment should be vacated and the case remanded for retrial.

**Facts**

During the prosecution's case-in-chief, on the fourth day of a nine-day trial, a police detective witnessed one juror turn to another during the trial and mouth the words "He's guilty." Tr. at 513.

In response, before asking counsel how they wanted to proceed, the trial judge said,

> I don't consider this a matter of great significance. I have a feeling that every jury that's ever been empaneled reaches some conclusions at some point of the case. I will, however, make this record just to establish that this incident did occur and that it was brought to our attention, and I will chew on them [the jury] when I send them home tonight, once again emphasizing the admonition to maintain an open mind until all of the evidence is received, and further pointing out that should someone have reached a conclusion that no amount of defense testimony could change a conclusion as to guilt or innocence, then, for God's sake, keep it to yourself until the matter is submitted to the jury for deliberation. And that's basically my intention.
> Is that a sufficient record? Mr. Henderson [defense counsel]?

Id. at 514. Defense counsel requested a modest investigation:

MR. HENDERSON: Your Honor, I would request that you do give a very detailed admonition to the jurors, and with no disrespect intended to the Court at all, I think some people could interpret the way that you've been repeating the admonition as almost kind of winking at the admonition, and I would request, first, that the Court inform the jurors that it's very important not to talk about the evidence. . . .

. . . .

The other thing that I -- and this is just a matter of style, and I'm trying to tread lightly here.

The other thing that I would request is that you ask the jurors if anyone has made any comments to you that you felt were inappropriate, that you could advise the bailiff of that, and that it would be a responsible thing for a juror to do.

There have been cases of jurors, you know, who have kind of lobbied during the trial, trying to lobby other jurors to, you know, reach a conclusion. I don't want that to happen here. So I think it would be appropriate to tell them that if you feel that someone's trying to communicate with you inappropriately, you can advise the bailiff of that, and just leave it at that.

THE COURT: I would be glad to say that for someone who's not on the jury.

MR. HENDERSON: Well, even if a member of the jury was trying to engage other jurors in a discussion of the case at this point, that would be inappropriate and it would be the right thing for the juror to do, to advise the bailiff so the Court could inquire further.

THE COURT: Very well.

Id. at 515-17.

At the end of that day's proceedings, in sending the jury home for the weekend, the judge admonished the jury as follows.

Members of the jury, we're going to break now for the weekend, and it becomes really critical that if someone asks you what the case is about, don't tell them, because I don't want you recounting testimony or explaining the parties' positions because that might fix one version or

-23-

one set of facts in your mind to the detriment of the defense, who have not yet been able to put on the full case.

So I'm going to say to you, again: Don't talk about the case or anyone connected with it until I finally chase you off to the jury room to decide the matter. *And if, based on the testimony you've heard so far, any one of you has reached a conclusion as to guilt or innocence and decided that there's no way that can be shaken, if that's happened, don't share it with anybody, unless and until you finally get into the jury room to decide the case;* and then that's the time to share those convictions and beliefs. So you're leaving for the weekend, so the previous admonition of the Court is reinforced and made stronger.

Id. at 645-46 (emphasis added).

Gianakos did not specifically object to this admonition and did not follow up on his request for limited investigation of juror misconduct. Nonetheless, the judge did not – as he had apparently agreed to do – instruct the jurors to tell the bailiff if other jurors had expressed their views of the case.[10]

At the end of the trial, before the case was submitted to the jury, Gianakos revisited the issue of juror #4's misconduct:

MR. HENDERSON: There is a juror -- I think it's juror number 4 -- . . . who made the comment that we believe -- where she mouthed the words "he's guilty" last week during trial . . . .

We request that that juror be dismissed. We have an alternate juror. I think that juror has shown prejudice, and there is cause to dismiss juror number 4 and have her replaced by the alternate at this point. And we formally move the Court for that relief.

---

[10]The trial judge did not say he would not instruct the jury to do this. The record, however, shows no such instruction, and Gianakos asserts on appeal – without contradiction by the government – that the judge failed to give this instruction. See Appellant's Br. at 53; Appellee's Br., passim.

-24-

THE COURT: Does the government have any position on that? I don't know. It's -- I'm not sure that's what happened. It's what the detective indicated he believed he thought he saw.

MR. MYERS [the prosecutor]: We would oppose that motion, Your Honor. This has been addressed earlier by the Court. We'll leave it at that.

THE COURT: Why don't you couple that comment in the alternative, just, again, to protect yourself and protect the record, with a motion for mistrial, if not granted.

MR. HENDERSON: Okay. Your Honor, if the Court does not decide not to dismiss juror number 4, we do ask for a mistrial.

THE COURT: Very good. And now your record is protected on that point, as well.

Id. at 1211-12. The judge denied both motions.

Before leaving this presentation of the facts, I must comment on the trial judge's late insinuation – which the majority opinion adopts, slip op., supra, at 13-14 – that we don't really know whether there was any juror misconduct here. Let there be no mistake: The sole evidence in the record concerning the alleged misconduct is the police detective's statement that he saw the juror mouth the words "He's guilty" to another juror. There is no countervailing evidence, no challenge to the detective's credibility, and no basis for any determination except that the misconduct happened. The trial judge accepted that the incident happened as the detective saw it, saying, "I will . . . make this record just *to establish that this incident did occur . . . .*" Tr. at 514 (emphasis added).[11] Only at the end of the trial did the judge – having failed to inquire into the alleged misconduct – equivocate.

---

[11]Detective Bryan Green, who was assisting the prosecution, is to be commended for advising the court and counsel of this incident.

The trial judge's failure, against the defendant's wishes, to conduct the necessary inquiry cannot be held against the defendant. On the evidence in the record, we must accept that the misconduct did occur.

**Requirements for a jury trial**

A criminal defendant has a right to a trial before an impartial jury. U.S. CONST. amend. VI. The burden of proof is on the government. See Victor v. Nebraska, 511 U.S. 1, 5 (1994).

To ensure that the burden of proof stays on the government, jurors must not make up their minds about guilt or innocence until they have heard all the evidence and can consider it all together. See Winebrenner v. United States, 147 F.2d 322, 328 (8th Cir. 1945). See also United States v. Resko, 3 F.3d 684, 688-89 (3d Cir. 1993); MANUAL OF MODEL CRIMINAL JURY INSTRUCTIONS FOR THE DISTRICT COURTS OF THE EIGHTH CIRCUIT, R. 1.08 (2002); KEVIN F. O'MALLEY ET AL., FEDERAL JURY PRACTICE & INSTRUCTIONS § 5.10 (5th ed. 2000). The prejudice caused by drawing conclusions prematurely is exacerbated if jurors prematurely express those conclusions to others. See Winebrenner, 147 F.2d at 328.

When a juror makes up her mind before hearing all the evidence, the burden of proof is effectively shifted, so far as that juror is concerned, onto the defendant. This effect is all the greater if the juror expresses her mind to others. As we said in Winebrenner sixty years ago:

> Such an opinion once formed could only be removed, if at all, by evidence. This in effect shifted the burden of proof and placed upon the defendants the burden of changing by evidence the opinion thus formed. A juror having in discussion not only formed but expressed his view as to the guilt or innocense of the defendant, his inclination thereafter would be to give special attention to such testimony as to his mind

-26-

strengthened, confirmed or vindicated the views which he had already expressed to his fellow jurors, whereas, had there been no discussion and no expression of tentative opinion, he would not be confronted with embarrassment before his fellow jurors should he change the tentative opinion which he might entertain from hearing evidence.

Id. at 328.

A juror who makes up her mind before hearing all the evidence is biased. She is biased in that she effectively holds the defendant to an impermissible burden of proof. Bias need not result from personal animus. Juror bias is simply the inability to decide the case properly and impartially on all of the evidence. A juror's shifting the burden to the defendant precludes the juror from properly, lawfully deciding the case.

**The trial judge's error**

Fundamentally, the trial judge simply did not think it was important whether jurors made up their minds before hearing all the evidence. Nor did he think it was important whether they talked about the case before hearing all the evidence. The judge is wrong on both counts. This simple, fundamental misunderstanding is behind each of the judge's three errors.

*The principal issue is juror #4's individual bias.*

The trial judge's error relates principally to juror #4's bias. Only a single issue presents itself as to juror #4: Whether the trial judge took proper action regarding juror #4's misconduct. The judge's error came in three stages, however, at Gianakos' three requests for relief: (1) investigate her conduct (refused), (2) give proper instructions to correct misconduct (admonition given made a bad situation worse), and (3) strike juror #4 or grant a mistrial (refused).

-27-

The final request to strike the juror or grant a mistrial was the culmination of Gianakos' efforts to avoid a tainted jury. This final effort necessarily called into question and included an effort to correct the judge's failure to investigate juror #4's misconduct and the judge's further error in giving an admonition that validated #4's bias.

Gianakos' motion to dismiss juror #4 or for a mistrial preserved for appellate review the judge's mishandling of juror #4's bias at all three stages.[12] Thus, as to

---

[12] The majority opinion states that Gianakos' motion to dismiss a biased juror before the case was submitted to the jury was untimely. Slip op., supra, at 14, n.6. Ordinarily, we deem an objection timely and sufficient to preserve an issue for review if it is made at such a time "that the trial court has an opportunity to prevent or correct error," United States v. Wolk, 337 F.3d 997, 1003 (8th Cir. 2003). Additionally, the objection must be made early enough to avoid excessive waste of time and resources. Cf. United States v. Parham, 16 F.3d 844, 848 (8th Cir. 1994) (An objection to jury selection process is untimely if not made before the venire is dismissed and trial begun). As to juror #4's personal bias, Gianakos meets our usual standard of timeliness, because the motion to dismiss juror #4 came before the case was submitted to the jury, when juror #4 could readily have been replaced by an alternate juror – on hand for just this sort of contingency.

The majority opinion applies a different standard to this case, however, quoting Yannacopoulos v. General Dynamics Corp., 75 F.3d 1298 (8th Cir. 1996) for the proposition that "When a party waits until the end of a case to complain of juror misconduct, . . . the objection is waived." Slip op., supra, at 14, n.6. Yannacopoulos is not comparable to this case. In Yannacopoulos, the case was submitted to the jury. The jury requested a dictionary definition. The judge called the jury in to say he could not give them a definition. A juror said aloud to another juror, "I'll look up that word . . . tonight." The judge immediately responded by admonishing the jury not to do outside research. Yannacopoulos was silent on the issue. The next morning, the judge revisited the matter on his own motion, to explain the reason for the ban on outside research. Yannacopoulos again was silent on the matter. The jury continued deliberating and returned a verdict. After the verdict, Yannacopoulos for the first time requested investigation to determine whether any juror had checked a dictionary. In ruling on Yannacopoulos' appeal, we said, "When a party waits until the end of a

-28-

juror #4, the trial judge's mishandling is reviewable under the harmless error standard.

Apart from juror #4's bias, the judge's errors at the first two stages also relate to the jury at large. Gianakos' request for investigation extended to the speculative (though reasonable) fears that other jurors had engaged in misconduct as juror #4 did and that #4 had contaminated other jurors by lobbying them for a guilty verdict. The judge's refusal to investigate relates to these general speculative issues. Similarly, the judge's erroneous admonition invited all members of the jury to make up their minds before hearing all the evidence. Because Gianakos' motion to dismiss juror #4 and alternative motion for a mistrial addressed only that one juror, the motions did not preserve for review the judge's errors with respect to the jury at large. With respect to the jury at large, therefore, the plain error standard applies.

The majority opinion, in treating the judge's errors at the first two stages, does not consider them with respect to juror #4's individual bias. Rather, the majority opinion conducts only a cursory plain error analysis, determining that the matter did not require investigation, and (in a footnote) that the judge's admonition was good enough, though erroneous. See slip op., supra, at 12.

In discussing the trial judge's final ruling, denying Gianakos' motion to dismiss juror #4, the majority opinion does touch briefly on juror #4's bias. It does so, however – as I explain below – without addressing the Winebrenner problem of a juror shifting the burden of proof to the defendant, by making up her mind before hearing all the evidence.

---

case to complain of juror misconduct, *as Yannacopoulos did*, the objection is waived." 75 F.3d at 1304 (emphasis added).

I agree with Yannacopoulos. But of course Gianakos did not wait as Yannacopoulos did. All through the trial Gianakos sought appropriate relief.

*The trial judge erred by refusing to dismiss a biased juror.*

The trial judge's errors with respect to juror #4 personally – as opposed to the errors with respect to the jury at large – culminated in the judge's refusal to dismiss juror #4 at the end of the trial. I address this final ruling first, because it most clearly and simply determines the proper outcome of this appeal. The trial judge erred, and the government has not shown the error to be harmless beyond a reasonable doubt.

The trial judge has discretion in addressing allegations of juror misconduct or juror bias. United States v. Caldwell, 83 F.3d 954, 955 (8th Cir. 1996). The judge commits error only by abusing that discretion. Where the issue was preserved for review by a timely objection, such error requires reversal unless the government can show beyond a reasonable doubt that the error was harmless. Neder v. United States, 527 U.S. 1, 7-8 (1999). If the issue was not preserved for review, we can reverse only if there is plain error. United States v. Olano, 507 U.S. 725, 735-36 (1993).

The issue of the judge's refusal to dismiss the juror was preserved for review. The trial judge explicitly said so, see Tr. at 1212, and the majority opinion appears to acknowledge this, see slip op., supra, at 14. We therefore review this ruling under the abuse of discretion and harmless error standards. The majority opinion says the trial judge did not abuse his discretion by refusing to dismiss juror #4. I strongly disagree.

In the course of trial, before the defense case had even begun, juror #4 turned to a fellow juror in open court and announced a conclusion as to the ultimate question of guilt or innocence: "He's guilty." Informed of this, the trial judge did nothing – nothing to remedy the bias created by the juror's premature decision-making, which shifted the burden of proof to the defendant. The judge's sole response was to give an admonition that did not correct the problem, but rather made it worse. The judge's

-30-

jury admonition indicated that it was perfectly OK for #4 to make up her mind before hearing all the evidence.

The judge had discretion in deciding how to deal with the problem. An appropriate response to an allegation of juror misconduct is suggested by <u>United States v. Evans</u>, 272 F.3d 1069, 1078-80 (8th Cir. 2001). There, we determined that the trial judge did not abuse his discretion in retaining a juror. The judge had interviewed the juror, after allegations of improper mid-trial discussion, and received sufficient assurance that the juror would hear all the evidence before deciding whether the defendant was guilty or innocent. Here, by contrast, the trial judge indicated to the jurors that they could make up their minds before hearing all the evidence. The trial judge here abused his discretion by choosing to put the court's seal of approval on the juror's bias.[13]

Addressing the problem of juror #4 contaminating the rest of the jury (as opposed to #4's own bias), the majority opinion says the trial judge did not abuse his discretion, because juror #4's "communication" was not necessarily prejudicial. Slip op., <u>supra</u>, at 14. But the issue as to juror #4's personal bias is not that she may have tainted another juror by what she said. The principal issue is that #4 had made up her mind before hearing all the evidence and thus shifted the burden of proof to the defendant. When a juror makes up her mind before hearing all the evidence and thus shifts the burden to the defendant, the defendant is prejudiced. <u>See</u> <u>Winebrenner</u>, 147 F.2d at 328.

The majority opinion's response to the principal issue of the judge's mishandling of juror #4's bias is simply that there is no evidence that juror #4

---

[13]It is a form of bias or prejudice to hold a defendant to an impermissible burden of proof. It would make no difference, however, if we called this burden-shifting by another name. Whatever we call it, this burden-shifting is impermissible, and a juror who does it should be disqualified.

acquired any extrinsic information and, "We have held that there is nothing wrong with a juror being influenced by prior testimony." Slip op., supra, at 14 (citing Evans, 272 F.3d at 1079-80). Juror #4's making up her mind before hearing all the evidence therefore did not require further action by the trial judge, the majority opinion says, because "The concern with bias is that a juror will decide a case on the basis of a pretrial predisposition against the interest of a party rather than on the basis of the evidence presented during the trial." Slip op., supra, at 14. This analysis misses the mark for two reasons.

First, our holding in Evans does not support the majority opinion. To the contrary, Evans throws into relief the trial judge's gross error here. Evans does not concern a juror prematurely deciding guilt without hearing the defendant's side. In Evans the trial court investigated allegations of improper jury discussion and received sufficient assurance that the juror in question could render a fair and impartial decision.

The trial judge in Evans asked, "Have you made a decision as you sit right now on guilt or innocence?" and the juror answered, "That would not be fair. No." The judge asked, "So you haven't done that?" The juror answered, "No." The judge asked, "And you're going to reserve making a decision on guilt and innocence until all the evidence is done?" The juror answered, "To the best of my ability." Evans, 272 F.3d at 1078. In Evans we held merely that the final answer, though not an unequivocal "Yes," was sufficient assurance that the juror would render an impartial decision. See Id. at 1080 ("Therefore, we conclude that the District Court's decision to accept the juror's assurance of impartiality as sufficient was within its discretion.").

This case is nothing like Evans. Here the judge failed to obtain any assurance that juror #4 had not made a decision as to guilt. The judge failed to obtain any assurance that juror #4 could reserve making a decision "until all the evidence is

done." Most strikingly, the judge indicated that it was OK for juror #4 – and every other juror as well – to make up her mind before hearing all the evidence.

Second, it is wrong to say "The concern with bias is that a juror will decide a case on the basis of a pretrial predisposition against the interest of a party rather than on the basis of the evidence presented during the trial." Slip op., supra, at 14. But that is not the only concern pertaining to bias. Another concern – the one presented by this case – is that when a juror makes up her mind before hearing all the evidence, the burden of proof is effectively shifted improperly to the defendant. See Winebrenner, 147 F.2d at 328.

The majority opinion simply does not address the Winebrenner problem that we face here.

Presented with a problem of juror bias, the trial judge rejected remedial action. Instead, the judge reinforced the bias and refused to dismiss the biased juror. Without question, the judge acted improperly and abused his discretion.

Was the judge's error harmless beyond a reasonable doubt? No. The presence of a juror with demonstrated bias can never be found harmless beyond a reasonable doubt. Jury deliberations are a black box. We cannot know what effect the bias had on the biased juror herself, nor can we know what influence the biased juror had on the rest of the jury. The government says only that the jury deliberated for a lengthy period, so it must have deliberated properly. To the extent this observation is even relevant, it cuts against the government – suggesting that the decision for the jury may have been close and difficult, and that juror #4's bias may therefore have been decisive in getting a guilty verdict. We cannot say there is no reasonable doubt that the error was harmless. Quite the reverse. There is little doubt that the error was harmful.

*The trial judge erred by allowing jurors to make up their minds before hearing all the evidence.*

After juror #4 expressed a premature conclusion as to the ultimate question of Gianakos' guilt or innocence, the trial judge admonished the jury as follows: "[I]f, based on the testimony you've heard so far, any one of you has reached a conclusion as to guilt or innocence and decided that there's no way that can be shaken, if that's happened, don't share it with anybody . . . ." Tr. at 645-46. The judge thus confirmed to juror #4 that it was OK for her to have made up her mind four days into a nine-day trial, during the prosecution's case-in-chief, before hearing the defense case. The judge validated #4's bias, which effectively shifted the burden of proof, so far as #4 was concerned, to the defendant. See Winebrenner, 147 F.2d at 328. See also Resko, 3 F.3d at 688-89.

More, the instruction indicated to other jurors that it was not improper for them to make up their minds before hearing all the evidence.

The majority opinion acknowledges that the trial judge thereby erred as a matter of law. Slip op., supra, at 12 n.5. The judge thus abused his discretion. Insofar as the erroneous instruction applied to juror #4, Gianakos preserved the error by moving for the dismissal of that juror. The judge's error as to juror #4 requires reversal, then, unless it is clear beyond a reasonable doubt that the error was harmless. As I have already discussed, that is not clear. We must, then, reverse.

The majority opinion simply does not address the judge's error as it relates specifically to juror #4 (by ratifying and reinforcing her demonstrated misconduct). The majority opinion addresses the error (in a footnote) only as a plain error issue relating to the jury at large. See Id.

Insofar as the judge's error affected the jury at large, it was not preserved for review. Regardless, in this respect, too, we should reverse. The error – effectively misallocating the burden of proof – is in the narrow category of errors that affect the entire structure of the trial and therefore require reversal even if not preserved for appellate review. Cf. Neder, 527 U.S. at 8-9.

*The trial judge erred by refusing to investigate the scope of juror misconduct.*

Gianakos specifically requested the trial judge to investigate – by instructing the jurors to tell the bailiff if other jurors had made inappropriate comments about the case – whether there had been jury discussion of the case other than the single known instance. Despite the request, the judge did nothing to investigate.

The trial judge abused his discretion by failing to investigate the problem of premature discussions among jurors. The duty to investigate serious, credible allegations of misconduct is precisely that, a duty. See United States v. Shackelford, 777 F.2d 1141, 1145 (6th Cir. 1985). See also United States v. McVeigh, 153 F.3d 1166 (10th Cir. 1998); United States v. Bertoli, 40 F.3d 1384, 1393 (3rd Cir. 1994).

The judge had discretion to assess the gravity of the situation and to respond with reasonable measures. This includes the discretion reasonably to determine that an allegation is not credible or serious enough to pursue. See United States v. Williams, 77 F.3d 1098, 1100 (8th Cir. 1996) (cited in slip op., supra, at 13) (holding that defendant was not entitled to a new trial or to a post-trial evidentiary hearing concerning potential misconduct on the basis that a juror gave an incorrect answer to a vague question on voir dire).

Faced with a serious, credible allegation that a juror had in open court, during trial, expressed a conclusion as to the ultimate question of guilt or innocence, the judge had no discretion to refuse to investigate at all. The judge abused his

-35-

discretion. The judge chose to do nothing because he believed that premature decision-making and discussion by the jury is "not a matter of great significance." As our precedent makes clear, the judge was wrong.

Insofar as the trial judge's refusal to investigate pertains only to juror #4, the error was preserved and we review it under the harmless error standard. Again, we cannot say that the refusal to investigate was harmless beyond a reasonable doubt, and we must therefore reverse.

The majority opinion considers the refusal to investigate only as it pertains to the jury at large, and therefore reviews for plain error. As to the jury at large, the refusal to investigate presents a close question under the plain error standard – a question I do not address. Again, the majority opinion simply does not address the judge's refusal to investigate as it pertains specifically to juror #4, who engaged in misconduct in open court.

**Conclusion**

Faced with a serious, credible allegation that a juror had announced a conclusion as to the ultimate question of guilt or innocence before hearing all the evidence, the trial judge, despite the defendant's request, took no action to determine the extent or nature of jury misconduct. The judge then indicated to that juror and all other jurors that they could make up their minds before hearing the evidence. At the conclusion of trial, the judge refused to dismiss the juror who had demonstrated that she had made up her mind prematurely. The trial judge simply did not think that premature decision-making and discussion is an important problem in a jury trial. The judge was gravely mistaken.

Gianakos has twice been convicted of a brutal murder, and in my view it is unfortunate that the case demands that we send it back for a third trial. Such a

disposition, while regrettable, is necessary. Had the trial judge taken appropriate remedial measures toward demonstrated juror misconduct – and had the government not opposed such measures – this situation could have been avoided. An appropriate response, within the judge's discretion, would not have been unduly burdensome. Timely voir dire and additional instruction of juror #4 might (or might not) have provided sufficient assurance that she could serve impartially. In any case, an alternate juror was available, for just such situations as this, to replace juror #4. The government stated no reason why juror #4 should not be replaced. The trial judge gave no reason for refusing to dismiss the juror – except meritless equivocation about the previously accepted fact of juror misconduct, after having declined to investigate it.

Our system of justice relies heavily upon procedural protections to ensure that we get the right person, that we do not punish people for crimes they did not commit. Fundamental to these procedural protections are an impartial jury and the rule that the burden of proof is on the government. Gianakos has been sentenced to life imprisonment on the basis of a tainted jury verdict. In our system of law, such a verdict should not stand.

———————————————